# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| Kiowa Tribe, and Comanche Nation, ) | |
| ) | |
| Plaintiffs, ) | **CASE NUMBER: 5:22-CV-00425** |
| ) | |
| v. ) | |
| ) | |
| The United States Department of the ) | |
| Interior, et al. ) | |
| Defendants. ) | |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.      The U.S. Government Establishes A Reservation for Three Tribes—Kiowa, Comanche, and Apache—and Later Imprisons Members of a Fourth Tribe on an Army Base Within the Reservation. ............................................... 2

II.     Reservation is Allotted and Jurisdictional Dispute with FSA Tribe is Resolved in Favor of Comanche Nation. ................................................ 4

III.    FSA Tribe Begins New Attempt to Conduct Gaming on Land Not Within its Jurisdiction. ....................................................................................... 6

ARGUMENT ..................................................................................................... 8

        A.      Standard of Review. ................................................................. 8

        B.      Plaintiffs Are Likely of Succeed on the Merits of Their Claims. ................. 8

                1.      IGRA Does Not Allow Gaming On Tsalote Allotment by FSA Tribe. ........................................................................ 9

                        a.      FSA Tribe Does Not Own Tsalote Allotment. ..................... 10

                        b.      Tsalote Allotment *Not* Within FSA's Jurisdiction. ............... 12

                        c.      Tsalote Allotment as Newly Acquired Land Not Eligible for Gaming by the FSA Tribe. ............................ 14

                2.      Gaming on the Tsalote Allotment by the FSA Tribe is a Violation of the RICO Act. ............................................. 15

                        a.      RICO Prohibits Conspiracies, Even Before Racketeering Begins. .............................................. 16

                        b.      Operation of the Warm Springs Casino Will Constitute a Substantive RICO Offense. ................................. 17

i.      FSA Tribe is an Enterprise that Affects Interstate Commerce, FSA Defendants Are Associated with FSA Tribe, and Participate in Conduct of Affairs of FSA Tribe. ............................ 17

ii.     FSA Tribe's Affairs Will Be Conducted Through a Pattern of Racketeering If the Warm Springs Casino Opens. ................................ 18

c.      FSA Defendants Have Agreed to Agree to the Objective of Opening Warm Springs Casino. ....................... 21

C.      Illegal Competition From Warm Springs Casino Will Irreparably Harm Plaintiffs. ........................................................................... 21

D.      Balance of the Harms Favors TRO. ........................................... 23

E.      Public Interest Favors TRO. ....................................................... 23

F.      Bond Should be Minimal. ........................................................... 24

CONCLUSION .............................................................................................. 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brumfiel v. U.S. Bank*,
   Civil Action No. 12-cv-02716-WJM, 2013 U.S. Dist. LEXIS 64935 (D.
   Colo. May 6, 2013) ..................................................... 24

*Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*,
   142 F.3d 1325 (10th Cir.), cert. denied, 525 U.S. 947 (1998) ................................ 5, 11

*Comanche Nation v. United States*,
   393 F. Supp. 2d 1196 (W.D. Okla. 2005) ............................................ *passim*

*Dine Citizens Against Ruining Our Env't v. Jewell*,
   839 F.3d 1276 (10th Cir 2016) ..................................................... 8

*Disney Enters. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ..................................................... 23

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   269 F.3d 1149 (10th Cir. 2001) ..................................................... 22

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*,
   317 F. Supp. 3d 504 (D.D.C. 2018) ............................................ 11

*Fort Sill Apache Tribe v. United States*,
   201 Ct. Cl. 630, 477 F.2d 1360 (1973) ..................................... 3

*Hicks v. Jones*,
   332 F. App'x 505 (10th Cir. 2009) .............................................. 8

*Idaho v. Coeur D'Alene Tribe*,
   794 F.3d 1039 (9th Cir. 2015) ..................................................... 22

*Kansas v. SourceAmerica*,
   874 F.3d 1226 (10th Cir. 2017) ..................................................... 22

*Kansas v. United States*,
   249 F.3d 1213 (10th Cir. 2001) ..................................................... 12

*Kiowa Tribe v. Mfg. Techs.*,
   523 U.S. 751 (1998) ..................................................... 22

*Miami Tribe of Okla. v. United States*,
    656 F.3d 1129 (10th Cir. 2011) ................................................................. 12

*Mustang Prod. Co. v. Harrison*,
    94 F.3d 1382 (10th Cir. 1996) ................................................................... 13

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ................................................................. 22

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ................................................................. 22

*In re Sac & Fox Tribe of the Miss. In Iowa/Meskwaki Casino Litig.*,
    340 F.3d 749 (8th Cir. 2003) ...................................................................... 9

*Salinas v. United States*,
    522 U.S. 52 (1997) ..................................................................................... 16

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985) ................................................................................... 17

*Thomas v. Carson*,
    30 F. App'x 770 (10th Cir. 2002) ................................................................ 8

*United States v. Cornell*,
    780 F.3d 616 (4th Cir. 2015) ..................................................................... 16

*United States v. E.C. Invs.*,
    77 F.3d 327, 330-31 (9th Cir. 1996) .......................................................... 19

*United States v. Gachot*,
    512 F.3d 1252, 1252, 1254 (10th Cir. 2008) ............................................. 19

*United States v. Posada-Rios*,
    158 F.3d 832 (5th Cir. 1998) ..................................................................... 16

*Warner Bros. Entm't v. Tusa*,
    No. 2:21-cv-05456-VAP-ASx, 2021 U.S. Dist. LEXIS 202562 (C.D.
    Cal. Aug. 16, 2021) .................................................................................... 23

*Winnebago Tribe v. Stovall*,
    341 F.3d 1202 (10th Cir. 2003) ................................................................. 24

**Statutes**

18 U.S.C. § 1166(c) ......................................................................................... 19

18 U.S.C. § 1955 .................................................................................................. 18, 19

18 U.S.C. § 1955(b)(1) ............................................................................................... 19

18 U.S.C. § 1956 .................................................................................................. 18, 20

18 U.S.C. § 1956(a)(1)(A) ........................................................................................... 18

18 U.S.C. § 1956(c)(7)(A) ........................................................................................... 18

18 U.S.C. § 1957 .................................................................................................. 18, 20

18 U.S.C. § 1957(a) ................................................................................................... 18

18 U.S.C. § 1957(f) ................................................................................................... 18

18 U.S.C. § 1961(1)(B) ............................................................................................... 18

18 U.S.C. § 1961(4) ................................................................................................... 17

18 U.S.C. § 1961(5) ................................................................................................... 21

18 U.S.C. § 1962(c) .............................................................................................. 16, 17

18 U.S.C. § 1962(d) .............................................................................................. 16, 21

18 U.S.C. § 1964(a) .............................................................................................. 15, 21

25 U.S.C. § 2710(b) ..................................................................................................... 9

25 U.S.C. § 2710(d) ..................................................................................................... 9

25 U.S.C. § 2719(a) ............................................................................................... 10, 15

25 U.S.C. § 2719(b) ................................................................................................... 10

25 U.S.C. § 2719(b)(1)(A) ........................................................................................... 10

25 U.S.C. § 2719(b)(1)(B)(i) ........................................................................................ 10

25 U.S.C. § 2719(b)(1)(B)(ii)-(iii),(b)(2)-(3) ................................................................ 10

Indian Gaming Regulatory Act ............................................................................... *passim*

RICO ...................................................................................................................... *passim*

**Other Authorities**

25 C.F.R. § 151.2(f)...................................................................................... 10

25 C.F.R. § 151.8.......................................................................... 1, 6, 10, 11

*Background and Legislative History*, 42 Ariz. St. L.J. 99, 132 (2010)............................. 9

*Indian Gaming Regulatory Act Symposium: The Indian Gaming Regulatory
    Act* ................................................................................................................ 9

Rule 65(c) ................................................................................................... 24

## INTRODUCTION

Plaintiffs Kiowa Tribe and Comanche Nation (collectively, "Plaintiffs") bring this motion to stop an illegal gambling business called the Warm Springs Casino that is set to open June 1, 2022.  The Warm Springs Casino is owned and will be operated by the Fort Sill Apache Tribe ("FSA Tribe").  However, the Warm Springs Casino is *not* authorized by the Indian Gaming Regulatory Act ("IGRA").  The Comanche Nation, United States, and FSA Tribe have already been before this Court, and a preliminary injunction previously issued, in *Comanche Nation v. United States*, 393 F. Supp. 2d 1196 (W.D. Okla. 2005).  That litigation permitted the FSA Tribe to have a single casino in Oklahoma (and a reservation of its own in New Mexico) but confirmed that the FSA Tribe has *no* share in the title to the historic Kiowa-Comanche-Apache[1] Reservation ("KCA Reservation") and *no* jurisdiction over allotments within that reservation that were issued to members of those three tribes.

As the adage goes—"give an inch, they will take a mile."  Upsetting the bargain struck in prior litigation, the FSA Tribe is now planning to open a new casino on an original Kiowa allotment, the "Tsalote Allotment."  Because the Tsalote Allotment is an original Kiowa allotment, it was not properly acquired for the FSA Tribe under the Treaty of Medicine Lodge and 25 C.F.R. § 151.8—none of the Comanche Nation, Kiowa Tribe, or Apache Tribe were notified or consented to the acquisition of this allotment.  Because the Tsalote Allotment is an original Kiowa allotment, the FSA Tribe also does

---

[1] Apache here refers to the Apache Tribe (formerly known as the Kiowa-Apache) which is an entirely different and distinct tribe from the FSA Tribe.  Compl. ¶ 21.

not have jurisdiction there.  Moreover, because the Tsalote Allotment was not acquired by the FSA Tribe prior to October 17, 1988, it is not eligible for gaming under IGRA.

For all these reasons, the FSA Tribe cannot conduct gaming on the Tsalote Allotment, and Plaintiffs are likely to succeed on the merits of their claims.  The Warm Springs Casino, on an original Kiowa allotment, cannot be authorized by IGRA, and Plaintiffs will succeed on their declaratory judgment claims.  As an unauthorized casino, the Warm Springs Casino is an illegal gambling business, and constitutes racketeering activity under RICO, and Plaintiffs will succeed on their RICO claim.  Additionally, the opening of the Warm Springs Casino will cause irreparable harm to Plaintiffs.  The illegal casino will divert revenue from Plaintiffs' lawful casinos, and reduce resources for Plaintiffs' government programs and the essential services they provide to their members.  Moreover, the balance of harms and public interest favor injunctive relief, the FSA Tribe has no cognizable interest in its illegal gambling business.  For all these reasons, and the others discussed below, the Court should grant Plaintiff's Motion for Temporary Restraining Order.

## BACKGROUND

## I.  THE U.S. GOVERNMENT ESTABLISHES A RESERVATION FOR THREE TRIBES—KIOWA, COMANCHE, AND APACHE—AND LATER IMPRISONS MEMBERS OF A FOURTH TRIBE ON AN ARMY BASE WITHIN THE RESERVATION.

This case concerns casino gaming on the KCA Reservation in southwestern Oklahoma.  The KCA Reservation was established by two treaties signed on October 21, 1867.  Compl. ¶ 20.  In the first treaty, the Treaty with the Kiowa, Comanche (Oct. 21,

1867) ("First Treaty of Medicine Lodge"), the United States set aside an Indian reservation for the Kiowa Tribe and Comanche Nation.  *Id.*  This treaty specifically noted that other tribes of Indians could not be settled on the reservation without the agreement of the Kiowa Tribe and Comanche Nation.  *See* First Treaty of Medicine Lodge, art. 2 (noting that reservation could be shared with "such other friendly tribes or individual Indians as, from time to time, they [i.e., the signatory tribes to the treaty, the Kiowa Tribe and Comanche Nation] may be willing [] to admit among them").  Later that same day, the Kiowa Tribe and Comanche Nation agreed to share their reservation with a third tribe, now known as the Apache Tribe of Oklahoma ("Apache Tribe"), previously known as the Kiowa-Apache.  Treaty with the Kiowa, Comanche, Kiowa-Apache, 1867 (Oct. 21, 1867) ("Second Treaty of Medicine Lodge").

Decades later, members of a fourth tribe, the Fort Sill Apache Tribe ("FSA Tribe"), came to reside within the borders of the KCA Reservation, but the FSA Tribe was never given title to the reservation or general jurisdiction therein.  In October 1871, an Executive Order carved 23,040 acres out of the KCA Reservation for use of an army base—Fort Sill.  Compl. ¶ 26.  From 1886-88, "hostile" Chiricahua Apaches from Arizona were imprisoned in St. Augustine, Florida and then Mobile, Alabama.  *Fort Sill Apache Tribe v. United States*, 201 Ct. Cl. 630, 633, 477 F.2d 1360, 1361 (1973).  In 1894, these Chiricahua Apache prisoners of war were transferred to Fort Sill.  Compl. Ex. 2 ("Settlement") ¶ 7(c).

## II.   RESERVATION IS ALLOTTED AND JURISDICTIONAL DISPUTE WITH FSA TRIBE IS RESOLVED IN FAVOR OF COMANCHE NATION.

At around the same time, the late nineteenth century, the U.S. Government's policy towards Indian affairs took a dramatic change.  Compl. ¶ 23.  While the Government previously pursued a policy of confining Indians to reservations, the Government began to pursue a policy known as "allotment."  *Id.*  Under "allotment," small parcels of reservation lands were granted to individual Indians, and the remainder was made available to non-Indian settlers.  *Id.* ¶ 24.  Relevant here, one such allotment (the "Tsalote Allotment) was granted to a member of the Kiowa tribe named George Tsalote.  *Id.* ¶ 26, Compl. Ex. 1; Hill Decl. Ex. 1.

The allotment policy also affected the Chiricahua Apache prisoners of war at Fort Sill.  Compl. ¶ 30.  In about 1914, the Chiricahua Apaches at Fort Sill were released from their imprisonment.  *Id.* ¶ 31.  They were each given a choice by the U.S. Government: they could either return to reservations in Arizona or take allotments in Oklahoma within the KCA Reservation.  *See* Relief of Apache Indian Prisoners of War at Fort Sill, 6132 1 (1922-1912) Oklahoma (May 11, 2022).  Approximately 164 Chiricahua Apaches chose to return to reservations in Arizona and approximately 76 chose to take allotments in Oklahoma.  *Id.* at pdf p. 7.  In 1976, those who took allotments in Oklahoma (or their descendants) received federal recognition as an Indian tribe—the Fort Sill Apache Tribe (the "FSA Tribe").  Compl. Ex. 2 (Settlement) ¶ 7(j).

The presence of a fourth tribe within the KCA Reservation, without a share to title in the KCA Reservation, has previously created confusion and antagonism.  For instance,

in 1992, the FSA Tribe became interested in acquiring a tract of Indian land (the "Kerchee Allotment") that belonged to a member of the Kiowa tribe, but had been originally allotted to a member of the Comanche Nation, Charlie Kerchee. *Comanche Nation*, 393 F. Supp. 2d at 1201. The BIA took the position that because the land was originally allotted to a Comanche member (i.e., an "original Comanche allotment"), the BIA was required to provide notice to and obtain consent from the Comanche Nation to transfer the Kerchee Allotment to the FSA Tribe. *Id.* In 1995, the BIA reversed course, and in 1996, the BIA incorrectly issued an opinion that the FSA Tribe shared jurisdiction over the KCA Reservation. *Id.*; Compl. ¶ 36; *see also* Compl. Ex. 2 ¶ 8.

In 1999, the BIA approved the acquisition by the FSA Tribe of the Kerchee Allotment, and in 2005, the FSA Tribe and Oklahoma submitted a tribal-state gaming compact to the state so that the FSA Tribe could open a casino with "Class III" gaming on the allotment. *Comanche Nation*, 393 F. Supp. 2d at 1201-02. The Comanche Nation brought suit, and this Court issued a preliminary injunction preventing Class III gaming. *Id.* at 1212. The Court found that Class III gaming by the FSA Tribe would cause irreparable harm, and that the balance of harms and public interest favored an injunction. *Id.* at 1211-12. The Court also concluded that "the issues as to whether the transfer of the 0.53 acres from [the Kerchee] Comanche Allotment [] to the FSA tribe without the Comanche Nation's consent violated the tribe's treaty rights, violated the applicable federal regulations and was contrary to the law as expounded in *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*, 142 F.3d 1325 (10th Cir.), cert. denied, 525 U.S. 947 (1998), deserve more deliberate consideration." *Id.* at 1212.

The parties then settled—the Comanche Nation agreed to permit gaming on the Kerchee Allotment alone, the BIA agreed not to permit any more acquisitions by the FSA Tribe of original Comanche allotments without consent of the Comanche Nation, the BIA further agreed to a reservation for the FSA Tribe in New Mexico, and the BIA finally agreed it would withdraw its 1996 opinion (confirming the fact that the FSA Tribe does *not* have jurisdiction over the KCA Reservation). Compl. Ex. 2 ¶¶ 7-8. The NIGC then approved the FSA Tribe's compact for Class III gaming with Oklahoma—a compact that strictly limits the FSA Tribe's gaming to its *own* Indian lands. Compl. Ex. 3, Ft. Sill Gaming Compact, Part 5(L). On November 16, 2011, the FSA Tribe was given a reservation in New Mexico. Federal Register Vol. 76, no. 228 (Nov. 28, 2011).

## III.    FSA TRIBE BEGINS NEW ATTEMPT TO CONDUCT GAMING ON LAND NOT WITHIN ITS JURISDICTION.

After settling the prior action, Plaintiffs believed any dispute regarding the FSA Tribe to be over, and that any gaming by the FSA Tribe on the KCA Reservation would be limited to the Kerchee Allotment. Compl. ¶ 41. However, in February 2022, the FSA Tribe announced that it had begun construction of a new casino, that it calls the Warm Springs Casino, on the Tsalote Allotment. *Id.* ¶ 43. Plaintiffs then learned that unbeknownst to them, and in violation of 25 C.F.R. § 151.8, the BIA had acquired the Tsalote Allotment in trust for the FSA Tribe on June 26, 2001. Compl. Ex. 1. Plaintiffs also learned that on September 18, 2020, the FSA Tribe submitted a letter to the National Indian Gaming Commission ("NIGC") informing the NIGC of its intent to construct and open a new tribal gaming facility on the Tsalote Allotment. Compl. Ex. 1.

In the letter, Defendant Gooday Ware, Chairperson of the FSA Tribe's Business Committee, falsely states that the FSA Tribe has the authority pursuant to IGRA to engage in gaming on the Tsalote Allotment. *Id.* at pdf p. 1. The opening of the Warm Springs Casino is now imminent. On April 26, 2022, the FSA Tribe announced a job fair scheduled for May 3, 2022, to hire employees for the casino. M. Tahdooahnippah Decl. Ex. 1. On May 19, 2022, the Comanche Nation learned that the Warm Springs Casino is scheduled to open on June 1, 2022. Compl. ¶ 51.

If the casino were to open, it would cause substantial and irreparable harm to Plaintiffs. The casino is only 16.1 miles from both the Kiowa Casino Verden and Kiowa Casino Carnegie, is only 22.6 miles from the Comanche Spur Casino, and is 32.7 miles from the Comanche Casino. Compl. ¶ 56. By competing in the same local market, the Warm Springs Casino will divert customers and cause the Plaintiffs' casinos to lose revenue. M. Tahdooahnippah Decl. ¶ 11; Compl. ¶¶ 56-57. Plaintiffs are dependent on gaming revenue to fund the essential governmental services they provide to tribal members—about 93% of the Comanche Nation's budget comes from gaming revenue, and about 60% of the Kiowa Tribe's budget comes from gaming revenue. Mantzke Decl. ¶ 3; Waters Decl. ¶5. Therefore, any decrease in gaming revenue will result in the reduction of services to tribal members. This includes important and vital services such as providing burial assistance, emergency housing and an assisted living center for elderly tribal members, a youth shelter for abused children, a tribal police force, prosecutor, and court to maintain law and order, prescription assistance and other health services, among other things. Compl. ¶¶ 53, 55; Mantzke Decl. ¶ 4; Waters Decl. ¶ 4.

Accordingly, Plaintiffs now bring this Motion to prevent any gaming activity by the FSA Tribe on the Tsalote Allotment.  Defendants Gooday Ware, Eagleshield, Dempsey, Mann, Heminokeky, Buckner, Koszarek, Hartford, Crump, and Pinola (the "FSA Defendants") are officials of the FSA Tribe.  Defendants U.S. Department of Interior, Newland, LaCounte (the "Federal Defendants") are the federal agency and officials in charge of the BIA, which improperly acquired the Tsalote Allotment in trust for the FSA Tribe in the first place.

## ARGUMENT

### A.  Standard of Review.

A temporary restraining order "preserves the status quo pending a determination of a preliminary injunction."  *Hicks v. Jones*, 332 F. App'x 505, 508 (10th Cir. 2009).  A party must satisfy the same four-part test whether they are seeking a TRO or a preliminary injunction.  *Thomas v. Carson*, 30 F. App'x 770, 772 (10th Cir. 2002).  That four-part test is: (1) plaintiff will suffer an irreparable injury unless the injunction issues, (2) a threatened injury outweighs any purported damage of an injunction, (3) the injunction will not be adverse to public interest, and (4) there is a substantial likelihood Plaintiff will succeed on the merits.  *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir 2016) (citations omitted).  All of these elements favor a temporary restraining order here.

### B.  Plaintiffs Are Likely of Succeed on the Merits of Their Claims.

Plaintiffs assert three claims—a claim seeking a declaratory judgment that the FSA Tribe does not own the Tsalote Allotment, a claim seeking a declaratory judgment

that gaming by the FSA Tribe on the Tsalote Allotment will violate IGRA, and a claim

under the RICO Act.  Plaintiffs have a substantial likelihood of success on the merits of

each.

### 1.  IGRA Does Not Allow Gaming On Tsalote Allotment by FSA Tribe.

As one can imagine, Indian gaming is a highly regulated industry.  An Indian tribe

cannot simply game anywhere at any time due its sovereign status, but instead must

follow the requirements of IGRA.  *In re Sac & Fox Tribe of the Miss. In Iowa/Meskwaki

Casino Litig.*, 340 F.3d 749, 762 (8th Cir. 2003) ("any tribe which elects to reap the

benefits of gaming authority created by the IGRA must comply with the IGRA's

requirements").  When IGRA was enacted, the location of gaming was of particular

concern to Congress; Congress wanted to address the concern that land would be

acquired for gaming near large cities or towns.  Franklin Ducheneaux, *Indian Gaming

Regulatory Act Symposium: The Indian Gaming Regulatory Act: Background and

Legislative History*, 42 Ariz. St. L.J. 99, 132 (2010).  Accordingly, IGRA governs *where*

gaming under the Act may occur.

First, a tribe may conduct gaming only on "Indian lands within such tribe's

jurisdiction."  *See* 25 U.S.C. § 2710(b) (concerning Class II gaming); *see also id.* §

2710(d) (permitting Class III gaming on Indian lands only if authorized by an ordinance

"adopted by the governing body of the Indian tribe having jurisdiction over such lands").

Second, IGRA prohibits gaming on Indian lands acquired after October 17, 1988 (the

date IGRA was enacted), unless (relevant here) "such lands are located in Oklahoma and

– (i) are within the boundaries of the Indian tribe's former reservation, as defined by the Secretary [of Interior]." 25 U.S.C. § 2719(a).[2]

These requirements pose an insurmountable problem for the Warm Springs Casino: the FSA Tribe does not validly own the land, does not have jurisdiction over the land, and acquired the land after the 1988 IGRA deadline.

### a. FSA Tribe Does Not Own Tsalote Allotment.

The transfer of the Tsalote Allotment to the FSA Tribe is void as it violated the BIA's regulations for land acquisitions.  When a tribe seeks to acquire land in trust (like the Tsalote Allotment) on a reservation[3] of another tribe (like the KCA Reservation), the governing body of the tribe having jurisdiction over that reservation (i.e., the Kiowa Tribe, Comanche Nation, and Apache Tribe) must consent in writing to the acquisition. 25 C.F.R. §§ 151.8; 151.2(f).  It was this regulation that the FSA Tribe and BIA violated previously when the FSA Tribe was permitted to acquire the Kerchee Allotment, *see Comanche Nation*, 393 F. Supp. 2d at 1202-03 (noting basis of claims asserted), and the FSA Tribe and BIA have once again violated the regulation in purporting to transfer ownership of the Tsalote Allotment to the FSA Tribe.

---

[2] This prohibition has several exceptions that are not implicated here. 25 U.S.C. § 2719(b).  Several of the exceptions concern tribes that receive federal recognition after IGRA was enacted, or specific exceptions for specific tribes (which are not FSA).  25 U.S.C. § 2719(b)(1)(B)(ii)-(iii),(b)(2)-(3).  Another exception is for settlement of a land claim.  25 U.S.C. § 2719(b)(1)(B)(i).  The Tsalote Allotment was not acquired by the FSA Tribe pursuant to any sort of land claim.  Finally, there is an exception if a tribe follows a process referred to as a two-part determination.  25 U.S.C. § 2719(b)(1)(A). The FSA Tribe did not receive a two-part determination.

[3] Which in the state of Oklahoma includes former reservations, per the BIA's regulations.  25 C.F.R. § 151.2(f).

None of the Kiowa Tribe, Comanche Nation, or Apache Tribe have consented to the transfer of the Tsalote Allotment to the FSA Tribe.  Compl. ¶ 59.  Accordingly, the transfer is invalid under 25 C.F.R. § 151.8.  On this point, the Tenth Circuit's decision in *Citizen Band Potawatomi Indian Tribe v. Collier*, 142 F.3d 1325 (10th Cir. 1998), is instructive and controlling.  In that case, land within the former Citizen Potawatomi Nation Reservation was taken into trust for the Absentee Shawnee Tribe.  *Id.* at 1326-27. Members of the Absentee Shawnee Tribe had resided in the Potawatomi Reservation and received allotments in that Reservation, but the Absentee Shawnee Tribe had not been given any rights to the reservation itself, as they did not occupy the land since time immemorial and were not given title to the reservation by Congress, the President, or the Potawatomi.  *Id.* at 1327-29.  Accordingly, the Tenth Circuit held that the trust acquisition was improper under the BIA's regulations because the Citizen Potawatomi Nation's treaty rights to their reservation had never been abrogated.  *Id.* at 1334.

The facts of *Citizen Band Potawatomi* are nearly identical to those here.  Here, just like the Absentee Shawnee, the FSA Tribe occupied a portion of the KCA Reservation (the Fort Sill Army base where they were imprisoned), and later received allotments within the KCA Reservation.  Compl. ¶¶ 30-32.  However, despite this occupancy, the FSA Tribe has no claim of right to title in the KCA Reservation itself.  The FSA Tribe has not occupied the land of the KCA Reservation since time immemorial—the FSA are originally from Arizona and New Mexico.  *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 317 F. Supp. 3d 504, 508 (D.D.C. 2018).  And, the FSA have not been given title to the KCA Reservation by Congress or the President. Compl. ¶ 33.

11

Therefore, the Tsalote Allotment was not properly acquired for the FSA Tribe, the transfer to it is void, and the Comanche Nation is likely to succeed on its claim for a declaration that the land is not owned by the FSA Tribe.  Because he FSA Tribe is not an owner of the Tsalote Allotment, the FSA Tribe has no claim to jurisdiction over that land and cannot conduct gaming there under IGRA.

### b.  Tsalote Allotment *Not* Within FSA's Jurisdiction.

Even if beneficial title to the Tsalote Allotment was validly transferred to the FSA Tribe (and it was not), the question becomes whether *jurisdiction* over the allotment (as opposed to merely its title) was ever transferred to the FSA Tribe.  Jurisdiction did not transfer because within the KCA Reservation jurisdiction over land remains with the tribe in which the original allottee was enrolled, notwithstanding any later transfers.

The touchstone of the inquiry into tribal jurisdiction over an allotment is the action, and purpose, of Congress—and, significantly, unilateral action by the FSA Tribe (such as purchasing land) cannot manufacture jurisdiction.  *See Miami Tribe of Okla. v. United States*, 656 F.3d 1129, 1144 (10th Cir. 2011) ("[The] threshold question of the Tribe's jurisdiction . . . focuses principally on congressional intent and purpose, rather than recent unilateral actions of the [] Tribe) (*quoting Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001)).  Here, no act of Congress can be said to have transferred jurisdiction of the Tsalote Allotment to the FSA Tribe.

The Tsalote Allotment is within the KCA Reservation.  The KCA Reservation was established by the Medicine Lodge Treaties for the Kiowa Tribe, Comanche Nation, and Apache Tribe.  The First Treaty of Medicine Lodge requires the consent of the Kiowa

Tribe and Comanche Nation for any other Indians to share land within the KCA Reservation.  First Treaty of Medicine Lodge, Art. 2.  While allotment diminished the land base of these three tribes, allotment did *not* diminish the jurisdiction of the three tribes over the allotments of their members.  *See Mustang Prod. Co. v. Harrison*, 94 F.3d 1382, 1384-85 (10th Cir. 1996) (holding that Cheyenne-Arapaho Tribe retained inherent authority to tax activities on land allotted to tribal members).  Neither the Kiowa Tribe nor Comanche Nation has ever agreed for the FSA Tribe to share jurisdiction over the KCA Reservation, nor has any act of Congress ever granted the FSA Tribe such jurisdiction.  Therefore, it is indisputable that at the time of allotment, the FSA Tribe did not and could not have had jurisdiction over the Tsalote Allotment.

Moreover, no act of Congress since allotment has ever transferred jurisdiction to the FSA Tribe.  At most, the beneficial title of the land has transferred to the FSA Tribe, but the mere transfer of title does not also transfer jurisdiction.  Indeed, due to the shared nature of the KCA Reservation, it is often the case that a member of a tribe different from the tribe of the original allottee comes to own an allotment.  It has been the longstanding understanding of the BIA and local tribes that, in such circumstances, jurisdiction over an allotment remains with the tribe in which the original allottee was enrolled.  This principle was recognized in the settlement of the prior *Comanche Nation* action.

In that case, the original allottee of the Kerchee Allotment was a Comanche Nation tribal member.  393 F. Supp. 2d at 1201.  However, the land was subsequently sold to a Kiowa member.  *Id.*  However, jurisdiction did not also transfer to the Kiowa tribe.  Instead, the Comanche Nation retained jurisdiction.  Indeed, the BIA understood

that any changes in ownership of the land required notice and consultation with the Comanche Nation, not Kiowa Tribe. *Id.* The Settlement Agreement reaffirmed this allocation of jurisdiction by expressly stating that jurisdiction over original Comanche Nation allotments *remains* with the Comanche Nation notwithstanding transfer to any other tribe or members of any other tribe. Compl. Ex. 2 (Settlement) ¶ 4.

The same must be true with respect to original Kiowa allotments—there is no material difference between the jurisdiction the Kiowa Tribe has over its original allotments, and the jurisdiction the Comanche Nation has over its original allotments. Indeed, all the applicable treaties, statutes, and regulations are identical. Accordingly, jurisdiction over the Tsalote Allotment remains with the Kiowa Tribe, even if the title has transferred to the FSA Tribe. Because the FSA Tribe does not have jurisdiction over the Tsalote Allotment, the FSA Tribe cannot conduct gaming there. Moreover, because the FSA Tribe does not have jurisdiction over the land, it is not the Tribe's Indian lands, and to the extent the FSA Tribe intends to offer Class III gaming, such gaming will violate the FSA Tribe's gaming compact with Oklahoma. *See* Compl. Ex. 3, Part 5(L). Accordingly, Plaintiff Comanche Nation is likely to succeed on the merits of its claim for a declaratory judgment that the Warm Springs Casino will violate IGRA.

### c. Tsalote Allotment as Newly Acquired Land Not Eligible for Gaming by the FSA Tribe.

Even if the FSA Tribe owned and had jurisdiction over the Tsalote Allotment (neither of which is true), the Tsalote Allotment still would not be eligible for gaming under IGRA. IGRA prohibits gaming on Indian lands in Oklahoma acquired after

October 17, 1988 unless the land is "within the boundaries of the Indian tribe's former reservation, as defined by the Secretary [of Interior]." 25 U.S.C. § 2719(a). The FSA Tribe did not acquire the Tsalote Allotment until June 26, 2001, well after October 17, 1988. Compl. Ex. 1. Moreover, the Tsalote Allotment is within the boundaries of the KCA Reservation, which as discussed above, was never shared by the FSA Tribe. Accordingly, the Tsalote Allotment is not within the boundaries of the FSA Tribe's former reservation, and it is not eligible for gaming by the FSA Tribe. For this additional reason, the Comanche Nation is likely to succeed on the merits of its claim for a declaratory judgment that gaming on the Tsalote Allotment violates IGRA.

**2. Gaming on the Tsalote Allotment by the FSA Tribe is a Violation of the RICO Act.**

Because the FSA Tribe does not have any authority under IGRA to conduct gaming on the Tsalote Allotment, the FSA Defendants' plans to open a casino there constitute a conspiracy to violate RICO. In particular, federal law criminalizes the operation of an "illegal gambling business," and prohibits the use of proceeds from an "illegal gambling business" to promote the carrying on of that business. Therefore the operation of the illegal Warm Springs Casino will constitute a pattern of racketeering activity. The Court has jurisdiction to issue an injunction to prevent violations of RICO, 18 U.S.C. § 1964(a), and the Court should issue a temporary restraining order preventing the opening of the casino on June 1, 2022.

### a.  RICO Prohibits Conspiracies, Even Before Racketeering Begins.

RICO makes it unlawful for any person "associated with" an "enterprise" that affects interstate commerce to "participate" "directly or indirectly" "in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  However, not only is participation in the conduct of an enterprise's affairs through a pattern of racketeering activity a RICO violation, but *conspiring* to do so is also a violation.  18 U.S.C. § 1962(d).  A RICO conspiracy requires: "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

As long as an agreement to violate RICO exists (such as an agreement to conduct the affairs of an enterprise through an ongoing illegal gambling business), RICO does not require that the actual pattern of racketeering (such as operation of illegal gambling business) to occur.  *Salinas v. United States*, 522 U.S. 52, 65 (1997) ("It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself."); *see also United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) ("to secure a conviction for RICO conspiracy, the government is not required to allege or prove the actual completion of a single racketeering act by the defendant or any other member of the conspiracy.").

All of the elements of a RICO conspiracy exist here.  Two or more people have agreed to commit a substantive RICO offense—in particular, the FSA Tribe's Business

Committee has agreed to open the Warm Springs Casino on the Tsalote Allotment—and the FSA Defendants know of and agree to this objective. Compl. Ex. 1.

### b. Operation of the Warm Springs Casino Will Constitute a Substantive RICO Offense.

The elements of a violation of § 1962(c) are: (i) the existence of an enterprise; (ii) the enterprise engaged in, or its activities affected, interstate or foreign commerce; (iii) a person was employed by or was associated with the enterprise; (iv) that person conducted or participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (v) that person participated in the affairs of the enterprise through a pattern of racketeering activity. *See, e.g., Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496-97 (1985). All of these elements are met here.

### i. FSA Tribe is an Enterprise that Affects Interstate Commerce, FSA Defendants Are Associated with FSA Tribe, and Participate in Conduct of Affairs of FSA Tribe.

The FSA Tribe is an "enterprise" that affects interstate commerce. A RICO enterprise can be "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The FSA Tribe is a legal entity that has been in continuous existence since 1976, has employees, and an official hierarchy, with the Business Committee managing the overall business of the tribe. Compl. ¶¶ 32, 78-85. The FSA Tribe also has a shared purpose of generating revenue for tribal members. *Id.* The FSA Tribe also affects interstate commerce. *Id.* ¶ 78. The FSA Tribe has land in both New Mexico and Oklahoma. *Id.* The FSA Tribe has hired a construction firm based in

Minnesota to construct the Warm Springs Casino. *Id.* ¶ 79. The FSA Tribe also has advertised the Warm Springs Casino in interstate commerce on social media. *Id.*

The FSA Defendants are "associated with" the FSA Tribe and "participate," directly or indirectly, in the conduct of the FSA Tribe's affairs. Defendants Gooday Ware, Eagleshield, Dempsey, Mann, Heminokeky, and Buckner are the members of the FSA Business Committee. Compl. ¶¶ 80-85. As such, they are the persons ultimately responsible for overseeing the decisions of FSA Tribe, including the decision to pursue constructing and opening the Warm Springs Casino. Defendants Koszarek, Hartford, Crump, Pinola, and Baker are members of the FSA Gaming Commission. *Id.* at 12, 82-85. As members of the Gaming Commission, these Defendants are responsible for supervising the FSA Tribe's gaming operations, including the Warm Springs Casino.

### ii. FSA Tribe's Affairs Will Be Conducted Through a Pattern of Racketeering If the Warm Springs Casino Opens.

The FSA Defendants have agreed to conduct the FSA Tribe's affairs through a pattern of racketeering activity. "Racketeering activity" is defined to specifically include operating an "illegal gambling business" (as defined by 18 U.S.C. § 1955) and also money laundering (as defined by 18 U.S.C. §§ 1956, 1957). 18 U.S.C. § 1961(1)(B). Money laundering includes knowingly using the proceeds of racketeering activity (which again is defined to include an "illegal gambling business") in a financial transaction with the intent to carry on such racketeering activity. 18 U.S.C. § 1956(a)(1)(A),(c)(7)(A). It is also illegal to knowingly engage in a monetary transaction using proceeds of racketeering (such as an "illegal gambling business") worth more than $10,000. 18

U.S.C. § 1957(a), (f).  Accordingly, the continuous operation of the Warm Springs

Casino, as planned, will constitute a pattern of racketeering activity.

The Warm Springs Casino will be an "illegal gambling business" because it is

unauthorized by IGRA or Oklahoma state law.  An "illegal gambling business" means:

a gambling business which—

> (i)is a violation of the law of a State or political subdivision in which it is
> conducted;

> (ii)involves five or more persons who conduct, finance, manage, supervise,
> direct, or own all or part of such business; and

> (iii)has been or remains in substantially continuous operation for a period in
> excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1955(b)(1).  The Warm Springs Casino will meet all of these elements.

Federal law permits gambling by Indian tribes when done in accordance with

IGRA.  18 U.S.C. § 1166(c).  However, when unauthorized by IGRA, federal law

extends state law to Indian Country and prohibits "illegal gambling business[es]" under

18 U.S.C. § 1955.  *See United States v. Gachot*, 512 F.3d 1252, 1252, 1254 (10th Cir.

2008) (affirming conviction under § 1955 of Kiowa tribal member operating cockfighting

on Indian land in Oklahoma); *United States v. E.C. Invs.*, 77 F.3d 327, 330-31 (9th Cir.

1996) (holding that § 1955 applies to an Indian tribe's casino, and the consultants

operating that casino, where the tribe had not complied with IGRA's requirements for

Class III machines).

Because the Warm Springs Casino is not authorized under IGRA (as discussed

above), and the FSA Tribe is not otherwise authorized by state law to conduct gambling

(such as by being a charity or horse track), Compl. ¶¶ 94-96, the Warm Springs Casino will be an "illegal gambling business." The Warm Springs Casino will involve more than five persons in the conduct, management, supervision, and direction of its affairs. Indeed, the FSA Defendants themselves number more than five and will be involved in the conduct, management, supervision, and direction of the casino. Compl. ¶ 91. In addition, the FSA Tribe also held a job fair, looking to hire dozens of more employees that will be responsible for conducting, managing, supervising, and directing the gambling activities at the Warm Springs Casino. M. Tahdooahnippah Ex. 1. The Warm Springs Casino will not be a temporary casino—it is intended to be in operation for more than thirty days. Compl. ¶ 92. Based on its size, the Warm Springs Casino will also have more than $2,000 in any single day. *Id.* The Warm Springs Casino will be 5,000 square feet and be able to comfortably fit more than 100 gaming devices and earn far more than $2,000 in gross revenue per day. M. Tahdooahnippah Decl. ¶¶ 7-8.

Because the Warm Springs Casino will be an "illegal gambling business," the use of its proceeds to pay operating expenses, such as payroll, utility, and maintenance, will constitute "carrying on" an illegal gambling business. Compl. ¶ 99. And, the distribution of more than $10,000 to the FSA Tribe, which is the purpose of the casino in the first place, will constitute a transaction in criminally derived property. Comp. ¶ 99-100. And, because the FSA Defendants know the Tsalote Allotment is an original Kiowa allotment, *see* Compl. Ex. 1 (FSA letter to NIGC), they know that the FSA Tribe has no jurisdiction. As such, they will knowingly be engaging in money laundering under 18 U.S.C. §§ 1956, 1957. These planned acts of running an illegal gambling business and money laundering

will constitute a "pattern" of racketeering. *See* 18 U.S.C. § 1961(5) (defining "pattern of racketeering activity" to be at least two acts of racketeering within ten years of each other). Accordingly, the operation of the Warm Springs Casino will constitute a RICO violation.

### c. FSA Defendants Have Agreed to Agree to the Objective of Opening Warm Springs Casino.

Not only will the operation of the Warm Springs Casino constitute a pattern of racketeering and a violation of RICO, the FSA Defendants know of and agree to this objective. As discussed above, the FSA Defendants know that the Warm Springs Casino is intended to be on land that is ineligible for gaming by the FSA Tribe. Nonetheless, the FSA Defendants agree to the opening of the casino, and have taken action to open it. They passed a resolution agreeing to the casino, hired a construction company to build the casino, sent letters to the NIGC regarding the casino, and held a job fair to staff the casino. Compl. ¶¶ 45-51; Ex. 1. Accordingly, the FSA Defendants are conspiring under 18 U.S.C. § 1962(d) to violate RICO, and this Court has jurisdiction to issue an injunction to prevent the RICO violation. 18 U.S.C. § 1964(a).

### C. Illegal Competition From Warm Springs Casino Will Irreparably Harm Plaintiffs.

The opening of the Warm Springs Casino, set for June 1, 2022, will cause irreparable injury to Plaintiffs for which no adequate remedies exist at law. The Warm Springs Casino will directly compete with the Plaintiffs' own (lawful) casinos. The Warm Springs Casino is being constructed 16 miles away from *two* Kiowa casinos and within 33 miles of *two* Comanche casinos. Compl. ¶ 56. Due to this proximity, once

21

opened, there is a high likelihood that the Warm Springs Casino will divert customers and cause Plaintiffs' casinos to lose profits.  M. Tahdooahnippah Decl. ¶ 12; *see* Waters Decl. ¶ 5; Compl. ¶ 56.  These lost profits will cause irreparable harm.

First, Plaintiffs will never be able to recover money damages sufficient to compensate it for any lost profits because the Warm Springs Casino's profits will go to the FSA Tribe, which is entitled to sovereign immunity.  *Kiowa Tribe v. Mfg. Techs.*, 523 U.S. 751, 757 (1998).  Because claims for money damages against the FSA Tribe are barred by sovereign immunity, the injury to Plaintiffs from the FSA Tribe is irreparable. *Kansas v. SourceAmerica*, 874 F.3d 1226, 1250-1251 (10th Cir. 2017); *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Second, the harm to Plaintiffs caused by the illegal operation of the Warm Springs Casino is irreparable due to the intangible nature of the injuries it will cause.  *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1251 (10th Cir. 2001) ("harm to tribal self-government not easily subject to valuation . . ."); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001) (an effective monetary award is inadequate if it is difficult ascertain even after a full trial). The revenue from the Plaintiffs' casinos funds the tribal government—providing some 93% of the Comanche Nation's budget and 60% of the Kiowa Tribe's budget.  Mantzke Decl. ¶ 3; Waters Decl. ¶ 5.  In turn, the Comanche Nation tribal government provides essential services to its members.  Mantzke Decl. ¶ 4; Waters Decl. ¶ 4.  This includes services that provide intangible benefits such as a burial assistance, emergency housing

assistance for the elderly, youth shelter, health services, law enforcement, tribal court,

drug and alcohol rehabilitation, language and cultural preservation, and fire management,

among other things.  Mantzke Decl. ¶ 4; Waters Decl. ¶ 4.  If Plaintiffs cannot provide

these types of services to its members, the resulting harm will be difficult to quantify—

how can one quantify the benefit of providing a burial for an indigent person, the benefit

of providing help to an elderly person facing homelessness, the benefit of providing a

home to an abused child, the benefit of assisting someone recover from drug addiction,

the benefit of law enforcement, or the value preserving an endangered language?  None

of these benefits are fully quantifiable.  Therefore, Plaintiffs will suffer irreparable injury

without a temporary restraining order.

### D.  Balance of the Harms Favors TRO.

In contrast to the substantial harm that Plaintiffs will suffer, the FSA Tribe will

suffer no harm if enjoined from opening the Warm Spring Casino.  The Warm Springs

Casino is not operation and therefore the FSA Tribe will lose no revenue.  In addition, the

FSA Tribe has no legally-protectable interest in an illegal gambling business.  *See Disney*

*Enters. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) (that "harm caused by illegal

conduct does not merit significant equitable protection" is a "long-settled principle").

### E.  Public Interest Favors TRO.

The public interest favors an injunction.  The public has an interest in ensuring

that gaming operations are conducted pursuant to applicable laws, such as IGRA.  *See*

*Warner Bros. Entm't v. Tusa*, No. 2:21-cv-05456-VAP-ASx, 2021 U.S. Dist. LEXIS

202562, at *9 (C.D. Cal. Aug. 16, 2021) ("Defendant has offered no lawful interest for the Court to consider. Thus, the public interest is best served by an injunction . . .").

### F.  Bond Should be Minimal.

"A trial court has 'wide discretion' under Rule 65(c) in determining whether to require security" for a temporary restraining order or preliminary injunction. *Winnebago Tribe v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003).  This Court may require no bond, or a minimal bond, where the balance of interests favors the movant, this balance of interest includes "the showing of loss to the enjoined party [], the financial hardship on the moving party, and the impact of a security requirement on the moving party's ability to enforce [its] rights where a particularly important right is at issue. *Brumfiel v. U.S. Bank*, Civil Action No. 12-cv-02716-WJM, 2013 U.S. Dist. LEXIS 64935, at *24 (D. Colo. May 6, 2013).  The Court here should require a minimal bond—no more than $5,000.  A higher bond will take away the revenue available to Plaintiffs for their governmental services, discussed above.  In addition, this case seeks to vindicate particularly important rights of Plaintiffs, concerning jurisdiction within their shared reservation.

### CONCLUSION

For the foregoing reasons, Plaintiffs Kiowa Tribe and Comanche Nation respectfully requests that the Court grant its Motion for Temporary Restraining Order.

Dated:  May 25, 2022

Respectfully submitted,


*/s/ Forrest Tahdooahnippah*
Forrest Tahdooahnippah (OBA 34872)
forrest@dorsey.com
Amy Weisgram (to  be admitted pro hac vice)
weisgram.amy@dorsey.com
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600 (telephone)
(612) 340-2868 (facsimile)

*Attorneys for Plaintiff Comanche Nation*


Ryland Rivas (OBA 7608)
ryland@rivaslawoffice.com
Rivas Law
628 W. Choctaw Ave
Chickasha, OK 73018
(405) 222-3500 (telephone)

*Attorneys for Plaintiff*