# Exhibit 3




**MEMORANDUM**

TO: George T. Skibine, Acting Chairman

THROUGH: Penny Coleman, Acting General Counsel
Michael Gross, Associate General Counsel for General Law

CC: Elaine Trimble-Saiz, Director, Contracts Division

FROM: Jeffrey Nelson, Senior Attorney

DATE: January 7, 2010

RE: Indian Lands -- Iowa Tribe of Oklahoma; Whitecloud Allotment

---

This Indian lands opinion is prepared in response to the submission of a proposed management contract to the National Indian Gaming Commission ("NIGC") by the Iowa Tribe of Oklahoma ("the Tribe"). Pursuant to the Indian Gaming Regulatory Act ("IGRA"), the NIGC's regulations, and agency policy, the NIGC Chairman will not entertain approval of a proposed management contract unless the Tribe establishes that the gaming activities will be conducted on Indian lands eligible for gaming under IGRA. As further set forth in this document, the Tribe's proposed gaming site constitutes Indian lands upon which the Tribe may conduct gaming under IGRA.

## I. Background

The Tribe's proposed casino complex—including a hotel, administration building, special event center, and several parking lots—is planned for construction on approximately 170 acres of fee and trust land in Lincoln County, Oklahoma, less than 30 miles northwest of Oklahoma City and approximately five miles west of Chandler at U.S. Interstate 44 and State Highway 66. Currently, the Tribe plans to build the casino on 65 acres of trust land known as Parcel 58-B of the Julia Whitecloud Allotment. There were once plans to use both Parcels 58-B and the adjacent Parcel 58-A (15 acres) for the casino development, but the Tribe has not yet been able to obtain Bureau of Indian Affairs ("BIA") approval of a necessary transaction pertaining to Parcel 58-A. Therefore, the Tribe has revised the proposed scope of work in order to move forward with a casino to be constructed entirely within the 65-acre Parcel 58-B.

Although the current gaming plans are limited to Parcel 58-B, this memorandum will analyze the lands status of both Whitecloud Allotment parcels in anticipation that the Tribe may wish to expand its gaming activities onto both parcels if the BIA approves the necessary transaction for development of Parcel 58-A.

The legal land descriptions of the two trust parcels are:

**Parcel 58-A:**
W/2 E/2 W/2 NE/4 NW/4 and W/2 W/2 NE/4 NW/4 of Sec 15-14N-3EIM, Lincoln County, Oklahoma, consisting of 15 acres more or less.

**Parcel 58-B:**
E/2 E/2 W/2 NE/4 NW/4 and E/2 NE/4 NW/4 and SE/4 NW/4 of Sec 15-14N-3EIM, Lincoln County, Oklahoma, consisting of 65 acres more or less.

## II. History of the Site

On August 15, 1883, President Chester A. Arthur created a reservation for the Iowa Tribe in the Indian Territory (now Oklahoma). The full text of the executive order reads:

> It is hereby ordered that the following-described tract of country in the Indian Territory, viz: Commencing at the point where the Deep Fork of the Canadian River intersects the west boundary of the Sac and Fox Reservation; thence north along said west boundary to the south bank of the Cimarron River; thence up said Cimarron River to the Indian meridian; thence south along said Indian meridian to the Deep Fork of the Canadian River; thence down said Deep Fork to the place of beginning, be, and the same hereby is, set apart for the permanent use and occupation of the Iowa and such other Indians as the Secretary of the Interior may see fit to locate thereon.
>
> CHESTER A. ARTHUR.

*Reprinted in* 1 Indian Affairs: Laws and Treaties 843-44 (2d ed. Charles J. Kappler ed., Gov't Printing Office 1904).

This now-former reservation is depicted on a Department of the Interior map titled "Indian Territory of Oklahoma," Bureau of Land Management (2d Rev. June 15, 2005).

On February 13, 1891, Congress enacted a statute, 26 Stat. 749, to ratify an 1890 agreement by which the Iowa Tribe agreed to "relinquish to the United States all their right, title, claim and interest in and to and over" the Iowa Reservation, provided that

"[e]ach and every member of said Iowa Tribe of Indians shall be entitled to select and locate upon said Reservation or tract of Country eighty acres of land which shall be allotted to such Indian in severalty." *Id.* at 754. The statute further stated:

> Upon the approval of the allotments provided for herein by the Secretary of the Interior, he shall cause patents to issue therefore in the name of the allottees, which patents shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or in case of his or her decease, of his or her heirs or devisees according to the laws of the state or territory where such land is located, and that at the expiration of said period, the United States will convey the same by patent to said Indian or his heirs or devisees as aforesaid in fee, discharged of said trust and free of all incumbrance whatsoever.

*Id.* at 755.

In September 1891, Julia Whitecloud, a member of the Iowa Tribe, was granted Allotment 58, comprising 80 acres. The NIGC has not been provided with a copy of the 1891 patent, but this information is recorded in a BIA allotment record on file with the NIGC. Furthermore, the BIA has confirmed that the Whitecloud Allotment is within the former historic reservation boundaries of the Iowa Tribe of Oklahoma. *See* Letter from Dan Deerinwater, BIA Southern Plains Regional Director, to Penny Coleman, NIGC Acting General Counsel (June 22, 2009).

Notwithstanding the fact that Congress originally designated a 25-year trust period for Iowa Reservation allotments, the Whitecloud Allotment was subject to a number of trust period extensions and never lost its trust status. *See* Extension of the Trust or Restricted Status of Certain Indian Lands, 25 C.F.R. ch. I App. (2007); E.O. 2432 (Aug. 1, 1916), *reprinted in* 4 Indian Affairs: Laws and Treaties 1041 (Charles J. Kappler ed., Gov't Printing Office 1929) (10-year extension to 1926); E.O. 4435 (Apr. 29, 1926), *cited in* 25 C.F.R. ch. I App. (2007) (10-year extension to 1936); E.O. 7206 (Oct. 14, 1935), *reprinted in* 5 Indian Affairs: Laws and Treaties 678 (Charles J. Kappler ed., Gov't Printing Office 1941) (10-year extension to 1946); E.O. 9659 (Nov. 21, 1945), *reprinted in* 7 Indian Affairs: Laws and Treaties 1458 (Charles J. Kappler ed., Gov't Printing Office) (25-year extension to 1971); 33 Fed. Reg. 15,067 (Oct. 9, 1968) (5-year extension to 1976); 38 Fed. Reg. 34,463 (Dec. 14, 1973) (5-year extension to 1981); 43 Fed. Reg. 58,369 (Dec. 14, 1978) (5-year extension to 1986); 48 Fed. Reg. 34,026 (July 27, 1983) (5-year extension to 1991); 101 Pub. L. 301 § 3(a) (May 24, 1990) *codified at* 25 U.S.C. § 478-1 (applying the indefinite trust period extension in the Indian Reorganization Act (25 U.S.C. § 462) to all trust parcels).

Julia Whitecloud died in 1942 (Probate #45143-42). Her interest in Allotment 58 was divided between five children and three grandchildren. On February 6, 1963, the

Department of the Interior approved two trust deeds (on file with NIGC) that partitioned Allotment 58 into Parcels 58-A and 58-B.

### A. Subsequent History of Parcel 58-A

By means of the 1963 partition, the beneficial interest in Parcel 58-A was consolidated and transferred to Louis Kihega, one of Julia Whitecloud's sons. The trust deed for Parcel 58-A (copy on file) identifies the grantors and the grantee as "Indians of the Iowa Reservation." A BIA tract history report for Parcel 58-A identifies Louis Kihega and nine of the eleven grantors as members of the Iowa Tribe. This report identifies the other two grantors as members of the Otoe-Missouria Tribe.

According to notations on the BIA tract history report, Louis Kihega married Eunice Whitehorn, a member of the Otoe-Missouria Tribe. In 1974, the interest in Parcel 58-A conveyed equally to Louis's wife and two daughters, all three of whom were members of the Otoe-Missouria Tribe. In 1981, the 1/3 interest held by Louis' wife conveyed to their two daughters, who already held 1/3 interests, giving a 1/2 interest to their daughter Lois Kihega Moon and a 1/2 interest to their daughter Leora Marlene Kihega Echohawk. In 2003, the 1/2 interest held by Lois Kihega Moon conveyed to her son, James Moon Jr., a member of the Iowa Tribe.

The beneficial interest in Parcel 58-A currently is held in equal parts by Leora Marlene Kihega Echohawk, a member of the Otoe-Missouria Tribe, and James Moon Jr., a member of the Iowa Tribe. The Iowa Tribe plans to buy the undivided 1/2 interest currently held by James Moon through trust-to-trust transfer, but it is this transaction that the BIA has yet to approve. The current status is that on June 8, 2007, James Moon executed a trust deed (copy on file) to convey his interest in Parcel 58-A to the United States in trust for the Iowa Tribe. That trust deed has been submitted to the BIA, but the BIA has not yet taken final agency action to accept it into trust. If the BIA accepts the 1/2 interest into trust, the two land owners would be the Iowa Tribe and Ms. Echohawk. If that happens, the Iowa Tribe and Echohawk plan to enter a 25-year (renewable for another 25-year term) business lease with an enterprise arm of the Tribe (unexecuted draft on file). The parties are aware that the business lease also would have to be approved by the BIA before the Tribe's enterprise body could take possession of the land and expand the gaming facility thereon.

### B. Subsequent History of Parcel 58-B

When Allotment 58 was partitioned in 1963, Louis Kihega and his wife transferred their inherited interests in Parcel 58-B to seven individuals, all of whom are identified as "Indians of the Iowa Reservation" on the trust deed (copy on file). A BIA tract history report for Parcel 58-B identifies Louis Kihega and six of the seven grantees as members of the Iowa Tribe. The other grantee, Frances Little Crow, is identified as a member of the Otoe-Missouria Tribe. Since 1963, the interests in Parcel 58-B continued to fractionate, until more than 100 individuals owned undivided shares of the trust estate. These individuals were members of eleven different tribes, which included the Iowa

Tribe, but also included the Otoe-Missouria Tribe, the Ponca Tribe, the Osage Tribe, the Kiowa Tribe, the Pawnee Nation, the Citizen Potawatomi Nation, the Chickasaw Nation, the Choctaw Nation, the Creek Nation, and the Sac & Fox Nation of Missouri.

In order to advance its goals for this site, the Iowa Tribe offered to buy the fractionated interests of the landowners, and from 2006 to 2008, the Department of the Interior approved 65 deeds to restricted Indian land whereby the individual owners of Parcel 58-B conveyed their trust interests to the United States in trust for the Iowa Tribe, giving the Iowa Tribe more than an 80% ownership interest. The tribal memberships of the 65 grantors are as follows: 26 grantors are members of the Otoe-Missouria Tribe; 23 grantors are members of the Iowa Tribe; 10 grantors are members of the Pawnee Tribe; three grantors are members of the Kiowa Tribe; two grantors are members of the Osage Nation; and one grantor is a member of the Muscogee (Creek) Nation.

The Iowa Tribe has entered a 25-year business lease with its casino enterprise body, renewable for another 25-year term (copy on file). Although there are other landowners, the Tribe is the sole lessor. This is allowed by 25 U.S.C. § 2218(b), which establishes the applicable percentage of owners who must consent to an allotment lease, depending on how many owners there are. The BIA's records indicate that there are still more than 20 owners of the allotment parcel, which means that only the owner(s) of a majority of the interests must consent. 25 U.S.C. § 2218(b)(1)(D). Because the Tribe owns more than 80% of the interests, its consent is the only consent required. Accordingly, the BIA approved the lease in December 2008.

## III. Applicable Law

IGRA states that an Indian tribe may engage in gaming under IGRA only on "Indian lands" that are "within such tribe's jurisdiction." 25 U.S.C. § 2710(b)(1), (d)(1). Further, if the land upon which gaming is contemplated is not within the limits of a current Indian reservation, a tribe may conduct gaming only if it exercises "governmental power" over those lands. 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b). IGRA defines *Indian lands* as:

> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). The NIGC's regulations further clarify the definition by providing that:

> *Indian lands* means:
> (a) Land within the limits of an Indian reservation; or
> (b) Land over which an Indian tribe exercises governmental power and that is either—

> (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
> (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12.

Finally, IGRA prohibits gaming on Indian lands accepted by the Secretary of the Interior into trust for the benefit of an Indian tribe after October 17, 1988, unless the lands fall within certain statutory exceptions. *See* 25 U.S.C. § 2719.

## IV. Analysis

As discussed below, both parcels qualify as Indian lands upon which the Iowa Tribe may conduct gaming because they are held in trust for individual Indians and the Iowa Tribe; the Iowa Tribe has had long-standing legal jurisdiction over these parcels; the Iowa Tribe exercises present governmental power over these parcels; and to the extent that Section 2719 applies to the recent trust-to-trust conveyances, the parcels qualify for the Oklahoma former reservation exception.

### A. Trust Status

The proposed gaming sites are "lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or individual . . . ." 25 U.S.C. § 2703(4)(B). As detailed in Section II above, title to this allotment was held in trust by the United States for the benefit of Julia Whitecloud and her heirs from 1891 until 2006-2008, when a majority of the undivided shares in Parcel 58-B were conveyed to the United States in trust for the Iowa Tribe. The remainder of interests (< 20%), continues to be held in trust for individual Whitecloud heirs. Currently, Parcel 58-A continues to be held in trust for two Whitecloud heirs, but the Iowa Tribe has requested the BIA to approve a trust conveyance whereby the United States would hold 50% of the undivided shares in trust for the Iowa Tribe. Because the definition of *Indian lands* includes lands that are held in trust both for tribes and individuals, the parcels currently qualify under this part of the analysis and will continue to qualify should the BIA approve the Parcel 58-A trust conveyance to the Tribe.

### B. Legal Jurisdiction and Exercise of Governmental Power

For a tribe to be able to conduct gaming, the land on which it proposes to game must be land over which the tribe possesses jurisdiction and exercises governmental power. 25 U.S.C. §§ 2703(4)(B), 2710(b)(1), (d)(1).

#### 1. Jurisdiction

Tribal jurisdiction is a threshold requirement to the exercise of governmental power. *See e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-703 (1st

Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), *superseded by statute as stated in Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) ("In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger [IGRA]"); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (*Miami II*) (a tribe must have jurisdiction in order to be able to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) (*Miami I*) ("the NIGC implicitly decided that in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4), a tribe must first have jurisdiction over the land"); *State ex. rel. Graves v. United States*, 86 F. Supp. 2d 1094 (D. Kan. 2000), *aff'd and remanded sub nom*., *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001). This interpretation is consistent with IGRA's language limiting the applicability of its key provisions to "[a]ny Indian tribe having jurisdiction over Indian lands," or to "Indian lands within such tribe's jurisdiction." 25 U.S.C. §§ 2710(d)(3)(A), 2710(b)(1)); *see also Narragansett Indian Tribe*, 19 F.3d at 701-703. Therefore, whether the Tribe possesses jurisdiction over the trust parcels is a threshold question.

Generally speaking, an Indian tribe possess jurisdiction over land that the tribe inhabits if the land qualifies as "Indian country." *See Alaska v. Native Village of Venetie Tribal Gov't,* 522 U.S. 520, 527 n.1 (1998); *United Keetoowah Band of Cherokee Indians of Oklahoma v. United States Dept. of Housing and Urban Development*, No. 08-7025, slip op. at 11 n.5 (10th Cir. June 5, 2009) ("[A]s a general matter, Indian tribes exercise court jurisdiction over Indian country—reservations, dependent Indian communities, and Indian allotments."). Congress defined the term *Indian country* as: "(a) all land within the limits of any Indian reservation . . . , (b) all dependent Indian communities . . . , and (c) all Indian allotments, the Indian titles to which have not been extinguished . . . ." 18 U.S.C. § 1151. Although this definition applies directly only to federal criminal jurisdiction, the courts have also generally applied this definition to questions of civil jurisdiction. *Venetie,* 522 U.S. at 527.

The subject parcels are Indian country, because they are "Indian allotments, the Indian titles to which have not been extinguished." 18 U.S.C. § 1151(c). Still, the question remains whether the Iowa Tribe, in particular, is the tribe that "inhabits" this Indian country and thereby has jurisdiction over it. As detailed above in Section II, not every Whitecloud heir who owns an undivided share of the trust parcels is a member of the Iowa Tribe. In fact, 50% of the undivided interests in Parcel 58-A currently is held by a member of the Otoe-Missouria Tribe, and the parties have no plans to change that aspect of the ownership status—rather, the Tribe is planning to enter a lease with her. With regard to Parcel 58-B, the Iowa Tribe itself now holds more than 80% of the undivided interests in the land, but the minority interests are held by members of multiple tribes.

We are not aware of any federal case law that establishes whether a tribe maintains exclusive tribal jurisdiction over a former-reservation allotment granted to a member of that tribe when ownership of the allotment is later inherited in part by members of other tribes. After consulting with the DOI, the opinion of this office is that a tribe that had a reservation subject to allotment maintains exclusive tribal jurisdiction

over trust or restricted fee allotments granted to its members within its reservation unless the United States transfers jurisdiction over the land to another tribe through legislation or by trust deed. An inquiry into a tribe's jurisdiction focuses principally on congressional intent and purpose. *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001). Congress has the power to create or eliminate tribal rights, and in the absence of congressional action, "[a]n Indian tribe retains only those aspects of sovereignty not withdrawn by treaty or statute." *Id.* It would be difficult to square this legal underpinning with a decision that an Indian tribe automatically gains jurisdiction over new lands when one of its members inherits an ownership interest in an existing trust parcel under another tribe's jurisdiction, or that by the same operation the tribe of the original allottee could lose exclusive jurisdiction over an allotment taken from its own reservation. Moreover, such a system would exacerbate the jurisdictional morass of checkerboarding that currently exists because of the federal government's allotment policies and would greatly hinder a tribe's ability to do any long-term planning and governance concerning the allotted lands within its jurisdiction.

The opinion that the Iowa Tribe maintains its original tribal jurisdiction over the fractionated Whitecloud Allotment is supported—albeit indirectly—by several cases. In *DeCoteau v. Dist. County Court for the Tenth Judicial Dist.*, 420 U.S. 425 (1975), the U.S. Supreme Court determined that the Lake Traverse Indian Reservation in South Dakota was disestablished by act of Congress. *Id.* at 445. Although the opinion concerned Indian conduct on the ceded, non-Indian lands within the former reservation, the Court noted in dicta that: "It is common ground here that Indian conduct occurring on the trust allotments [within the former reservation] is beyond the State's jurisdiction, being instead the proper concern of tribal or federal authorities." *Id.* at 428. Consistent with that language, the Court later stated: "[T]he tribe and the [U.S.] Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs. In such a situation, exclusive tribal and federal jurisdiction is limited to the retained allotments." *Id.* at 446 (citing 18 U.S.C. § 1151(c); *United States v. Pelican*, 232 U.S. 442 (1914)). It went unstated in the opinion, but from context it seems clear that the Court was referring to exclusive tribal jurisdiction of the Sisseton-Wahpeton Tribe for which the Lake Traverse Indian Reservation was created and whose members received the allotments, without regard to the possibility that through inheritance, the allotments could eventually be owned in whole or in part by members of other tribes.

Similarly, in *Mustang Production Co. v. Harrison*, 94 F.3d 1382 (10th Cir. 1996), the Tenth Circuit held that even after Congress disestablished the Cheyenne-Arapaho Tribes' reservation in Oklahoma, "the allotted lands were set aside for the use of the Indians, remaining part of Indian country . . . over which the Tribes have civil jurisdiction." *Id.* at 1386. As in *DeCoteau*, the court in *Mustang* did not address whether the Cheyenne and Arapaho Tribes for which the reservation was created would lose or share jurisdiction with another tribe if an allotted parcel came to be held by a member or members of different tribes.

The Tenth Circuit's opinion in *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531 (10th Cir. 1995) contains a pronouncement that is in line with

its subsequent holding in *Mustang*: "[W]e believe the Navajo Nation has the authority to apply its Business Activities tax to the source gains from the 47% portion of the South McKinley Mine that lies within the [off-reservation] individual Navajo trust allotments." *Id.* at 1542 n.11. This language demonstrates the court's view that the Navajo Nation holds civil jurisdiction over trust allotments held by members of the Navajo Nation; but like the other cases, it does not address what the outcome would be if the trust allotments came to be held by members of different tribes.

The position that the Iowa Tribe maintains exclusive jurisdiction over the now-fractionated Whitecloud Allotment is not undermined by the Maria Christiana line of agency opinions and cases holding that the Miami Tribe of Oklahoma does not have jurisdiction over the Maria Christiana Allotment. The facts behind the Maria Christiana Allotment have at least three significant differences. First, the Maria Christiana Allotment was granted by Congress to an individual of Indian descent, but not a member of any tribe. *Miami Tribe v. United States*, 927 F. Supp. 1419, 1427 (D. Kan. 1996). Second, the Miami Tribe objected to the grant of allotments to non-members and eventually received cash payments (plus interest) for the divestitures. *Id.* at 1426. Therefore, the district court stated: "This court has no difficulty concluding from this series of events that plaintiff [Miami Tribe] unmistakably relinquished its jurisdiction over Reserve No. 35 [the Maria Christiana Allotment]." *Id.* (footnote omitted). And third, the applicable treaties and legislation regarding the Miami Tribe clearly contemplated that the Miami Tribe would move from its reservation in Kansas (location of the Maria Christiana Allotment) to Oklahoma, which it did. *Id.* In contrast to those facts, the allotment in this inquiry was granted to a member of the tribe seeking to exercise jurisdiction; the Iowa Tribe has always treated the parcel as being under its jurisdiction; the legislation that allotted lands within the Iowa Tribe's reservation did not contemplate that the Iowa Tribe would move away; and indeed the Iowa Tribe did not move from its Oklahoma land base when its reservation was allotted. For these reasons, the present issue is distinguishable from the line of cases concerning the Maria Christiana Allotment.

Therefore, it is this office's opinion that the Iowa Tribe maintains exclusive tribal jurisdiction over the Whitecloud Allotment.

**2. Governmental Power**

The next question is whether the Tribe exercises governmental power over the Whitecloud Allotment. *See* 25 U.S.C. § 2703(4)(B); *see also Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 703 (1st Cir. 1994).

IGRA is silent as to how NIGC is to decide whether a tribe exercises governmental power over lands at issue. Furthermore, the manifestation of governmental power can differ dramatically depending upon the circumstances. For this reason, the NIGC has not formulated a uniform definition of *exercise of governmental power*, but rather decides that question in each case based upon all the circumstances. *See* National Indian Gaming Commission: Definitions Under the Indian Gaming Regulatory Act, 57 Fed. Reg. 12382, 12388 (1992).

Caselaw provides some guidance. The First Circuit in *Narragansett Indian Tribe* found that satisfying this requirement depends "upon the presence of concrete manifestations of [governmental] authority."19 F.3d at 703. Such examples include the establishment of a housing authority, administration of health care programs, job training, public safety, conservation, and other governmental programs. *Id.*

In *Cheyenne River Sioux Tribe v. State of South Dakota*, 830 F. Supp. 523, 528 (D.S.D. 1993), *aff'd,* 3 F.3d 273 (8th Cir. 1993), the court stated that several factors might be relevant to a determination of whether a tribe exercises governmental power over subject lands for purposes of IGRA. The factors were:

(1) Whether the areas are developed;

(2) Whether the tribal members reside in those areas;

(3) Whether any governmental services are provided and by whom;

(4) Whether law enforcement on the lands in question is provided by the Tribe; and

(5) Other indicia as to who exercises governmental power over those areas.

*Id.* at 528.

In this matter, the Tribe has identified several actions that demonstrate its present exercise of governmental power over the planned casino site, which is currently used for residential purposes. Specifically, the following actions are significant:

(1) The Iowa Tribe provides (apparently rather extensive) law enforcement services on the site through the Iowa Tribal Police Department, as evidenced by a sample of tribal police reports and affiliated tribal police documents provided to the NIGC by the Tribe;

(2) The Tribe exercises criminal jurisdiction over the site, as evidenced by an Iowa Tribal Court pleading (criminal complaint) involving incidents on Parcel 58-A provided to the NIGC by the Tribe; and

(3) State law enforcement officials and prosecuting attorneys from surrounding jurisdictions recognize the Iowa Tribe's jurisdiction and lawful exercise of governmental power, as evidenced by a sample of police reports provided to the NIGC by the Tribe.

These actions constitute "concrete manifestations of governmental authority" over the Whitecloud Allotment. Therefore, the Tribe exercises governmental power over the site, and the site is Indian lands as defined by IGRA.

### C. After-Acquired Lands Prohibition

IGRA's general prohibition against gaming on after-acquired lands states: "Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless . . . [providing exceptions]." 25 U.S.C. § 2719. In this case, the Iowa Tribe obtained its trust interest in Parcel 58-B in 2006-2008, and the Tribe is still petitioning the BIA to approve its trust interest in Parcel 58-A. Therefore, there is an argument that the lands were or will be "acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." However, the after-acquired lands provision of IGRA is open to interpretation. In an earlier memorandum, the NIGC's Office of General Counsel considered a situation where the trust interest in an allotment was transferred on May 10, 2000, from a member of the Kiowa Tribe to the Kiowa Tribe itself. In that memorandum, we stated: "Because the property at issue has remained in trust, on behalf of a Kiowa tribal members [sic] and then on behalf of the Kiowa Tribe, the prohibition against Indian gaming on parcels acquired in trust after October 17, 1988 and the exceptions thereto set forth in 25 U.S.C. § 2719 do not apply." Memorandum from Jo-Ann M. Shyloski, Senior Attorney, to Philip N. Hogen, Chairman, re: Kiowa Indian Tribe of Oklahoma – Gaming Site at n.1 (Nov. 15, 2005).

It may be that the after-acquired lands prohibition should not apply where the trust acquisition does not transfer jurisdiction from one tribe to another. In this case, the Iowa Tribe has maintained jurisdiction over the proposed gaming site since well before IGRA's enactment in 1988. Recently, the Tribe has obtained trust-to-trust transfers that give the Tribe itself a significant trust interest in the land. Not all of these trust-to-trust transfers occurred between the Tribe and its members—in fact, a majority occurred between the Tribe and members of other tribes. But because the Iowa Tribe maintained jurisdiction over this land despite partial ownership by members of other tribes, these trust-to-trust transfers made no changes to tribal jurisdiction over the land. Therefore, there would be no congressional or public policy purpose served by applying the after-acquired lands prohibition.

In any case, even if the conveyances from members of other tribes to the Iowa Tribe trigger the general prohibition in Section 2719, then the Tribe still would not be prohibited from gaming on the site, because the Iowa Tribe qualifies for a Section 2719 exception. IGRA creates an exception to the after-acquired lands prohibition for an "Indian tribe [that] has no reservation on October 17, 1988, and—(A) such lands are located in Oklahoma and—(i) are within the boundaries of the Indian tribe's former reservation, as defined by the Secretary[.]" 25 U.S.C. § 2719(a)(2)(A)(i). The Iowa Tribe had no reservation on October 17, 1988; the subject lands are located in Oklahoma; and the BIA has confirmed that the site is within the boundaries of the Indian tribe's former reservation. *See* Letter from Dan Deerinwater, BIA Southern Plains Regional Director, to Penny Coleman, NIGC Acting General Counsel (June 22, 2009). Therefore, whether we consider Section 2719 to be triggered or not, the Iowa Tribe may lawfully conduct gaming activities on the Whitecloud Allotment.

**V. Conclusion**

The proposed casino site is located on Indian lands upon which the Iowa Tribe may conduct gaming under IGRA. Therefore, the Chairman of the NIGC may approve the proposed management contract, assuming all other requirements are met.

The Department of the Interior, Office of the Solicitor, concurs in this opinion. *See* Letter from Edith R. Blackwell, DOI Associate Solicitor – Division of Indian Affairs, to Penny Coleman, NIGC Acting General Counsel (Dec. 18, 2009).