**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **COMANCHE NATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-22-425-G** |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF THE INTERIOR et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>ORDER</u>**

Now before the Court are the Motion to Dismiss (Doc. No. 63) and Supplemental

Motion to Dismiss (Doc. No. 124) filed by the Federal Defendants.[1]  Plaintiff Comanche

Nation has responded (Doc. Nos. 81, 130) and the Federal Defendants have replied (Doc.

Nos. 108, 131).

*I.    Background*

Plaintiffs Comanche Nation and Kiowa Tribe filed this action on May 24, 2022,

raising three claims "to prevent an illegal casino from conducting unlawful gaming within

Plaintiffs' reservation" and seeking entry of a temporary restraining order.   Compl. (Doc.

No. 1) ¶ 1.   On June 3, 2022, the Court denied Plaintiffs' request for a temporary

restraining order.   *See* Order of June 3, 2022 (Doc. No. 31).

---

[1] The Federal Defendants are: the United States Department of the Interior ("DOI"); Bryan
Newland, in his official capacity as Assistant Secretary—Indian Affairs; Darryl LaCounte,
in his official capacity as Director of the Bureau of Indian Affairs ("BIA"); and Sharon
Avery, in her official capacity as Acting Chair of the National Indian Gaming Commission
("NIGC"), who is hereby substituted for Defendant Sequoyah Simermeyer pursuant to
Federal Rule of Civil Procedure 25(d).

Plaintiffs filed an Amended Complaint (Doc. No. 51) and a motion for preliminary injunctive relief against the FSA Defendants (Doc. No. 52).[2]  Plaintiff Kiowa Tribe then voluntarily dismissed its claims as to all defendants.  *See* Doc. Nos. 117, 118.  Following a telephonic status conference with the parties, the Court ordered the defendants to file any supplemental motions regarding the standing of remaining plaintiff Comanche Nation to continue to pursue this action.  *See* Order of Mar. 7, 2023 (Doc. No. 120).  The Federal Defendants and the FSA Defendants then each timely filed a supplemental motion to dismiss.  *See* Doc. Nos. 123, 124.

## II.    *The Amended Complaint*

Plaintiff Comanche Nation is a federally recognized Indian tribe that operates six or more casinos in southwestern Oklahoma.  Am. Compl. ¶ 4.  In 1867, through the First Treaty of Medicine Lodge and the Second Treaty of Medicine Lodge, the Kiowa-Comanche-Apache ("KCA") Reservation was established in southwestern Oklahoma.  *Id.* ¶¶ 22-24.

In 1892, the United States, through "the Jerome Agreement," "acquired a substantial portion of the KCA Reservation and allotted individual tracts of land to the individual members of the three tribes."  *Comanche Nation v. United States*, 393 F. Supp. 2d 1196,

---

[2]  The FSA Defendants are each sued in both their individual and official capacities and are identified as: Lori Gooday Ware, Fort Sill Apache Tribe ("FSAT") Chairwoman; Pamela Eagleshield, FSAT Vice-Chairman; James Dempsey, FSAT Secretary-Treasurer; FSAT Committee Members Jeanette Mann, Jennifer Heminokeky, and Dolly Loretta Buckner; Philip Koszarek, FSAGC ("Fort Sill Apache Gaming Commission") Chairman; Naomi Harford, FSAGC Vice-Chairman; and FSAGC Commissioners Michael Crump, Lauren Pinola, and Debbie Baker.

1200-01 (W.D. Okla. 2005); *see* Am. Compl. ¶¶ 25-26.   In 1901, the 160 acre-parcel of land within the KCA Reservation boundaries that is disputed in this matter was allotted to George Tsalote, a Kiowa Tribe member.   Am. Compl. ¶ 28.   This tract (the "Tsalote Allotment") "w[as] held in trust by the United States for the beneficial use of the Indian owner."   *Comanche Nation*, 393 F. Supp. 2d at 1201; *see* Am. Compl. ¶ 38.

On June 26, 2001, the Tsalote Allotment was deeded to the United States of America in trust for the Fort Sill Apache Tribe of Oklahoma (the "FSA Tribe").   Am. Compl. ¶ 46. "For years, the FSA Tribe held the Tsalote Allotment without attempting to exercise any form of jurisdiction on the land."   *Id.* ¶ 47.

In April of 2005, the DOI approved the FSA Tribe's Class III Tribal Gaming Compact with the State of Oklahoma.   *See id.* ¶¶ 41-42; *id.* Ex. 7 (Doc. No. 51-7).   In February of 2022, the FSA Tribe announced that it was constructing a casino, called the Warm Springs Casino, on the Tsalote Allotment.   Am. Compl. ¶ 47.   Comanche Nation, the Kiowa Tribe, and the Kiowa Comanche Apache Intertribal Land Use Committee began investigating how the FSA Tribe could be constructing a casino on the Tsalote Allotment. *Id.* ¶ 48.   Comanche Nation learned that on September 18, 2020, the FSA Tribe had submitted a letter to the National Indian Gaming Commission ("NIGC") informing the NIGC of its intent to construct and open a new tribal gaming facility on the Tsalote Allotment and requesting a 60-day expedited review pursuant to 25 C.F.R. § 559.2(a)(1). *Id.* ¶ 49.   Upon Comanche Nation's information and belief, the Chair of the NIGC has not responded to that request.   *Id.* ¶ 50.

On April 27, 2022, the Kiowa Comanche Apache Intertribal Land Use Committee

sent a letter to the NIGC, complaining of the Warm Springs Casino and requesting agency action, and supplemented that letter on April 28, 2022. *Id.* ¶ 51. The NIGC acknowledged receipt of the letter but has done nothing to stop or prevent the opening of the Warm Springs Casino. *Id.* ¶ 52. The Warm Springs Casino opened June 15, 2022, and offers both Class II and Class III gaming, as defined by the Indian Gaming Regulatory Act. *Id.* ¶ 53.

### III.     *Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)*

The Federal Defendants assert that Comanche Nation's allegations reflect that the Court lacks subject-matter jurisdiction to hear the claims of the Amended Complaint and, therefore, such claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1). Such a facial attack on the pleading's allegations regarding subject-matter jurisdiction "questions the [pleading's] sufficiency and requires the court to accept the allegations as true." *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009); *see also E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1302-03 (10th Cir. 2001). As the party asserting federal jurisdiction, Comanche Nation bears "the burden of alleging the facts essential to show jurisdiction." *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797 (10th Cir. 2002) (internal quotation marks omitted).

Citing Federal Rule of Civil Procedure 12(b)(6), the Federal Defendants also seek dismissal of the pleading for failure to state a claim upon which relief can be granted. In analyzing a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th

Cir. 2013).  "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'"  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in the pleading, the court discusses the essential elements of each alleged cause of action to better "determine whether [the plaintiff] has set forth a plausible claim."  *Id.* at 1192.

A complaint fails to state a claim on which relief may be granted when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555 (footnote and citation omitted).  Bare legal conclusions in a complaint are not entitled to the assumption of truth; "they must be supported by factual allegations" to state a claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

IV.    *Count One: Violation of 25 C.F.R. § 151.7*

In Count One, raised in the Amended Complaint against Defendants DOI, Newland, and LaCounte (collectively, the "BIA Defendants"), Comanche Nation seeks "a declaration that the Tsalote Allotment is not owned by the FSA Tribe."  Am. Compl. ¶ 66.  In support, Comanche Nation alleges that the 2001 transfer of the Tsalote Allotment to the FSA Tribe was invalid due to being undertaken in violation of 25 C.F.R. § 151.7.  *See id.* ¶¶ 60-65 (citing prior version of 25 C.F.R. § 151.8 (now codified with minor amendments at 25 C.F.R. § 151.7)).

That regulation provides in relevant part:

> An individual Indian or Tribe may acquire land in trust status on an Indian reservation other than its own only when the governing body of the Tribe having jurisdiction over such reservation consents in writing to the acquisition[.]

25 C.F.R. § 151.7.[3]

Comanche Nation contends that it is a "Tribe having jurisdiction" over the KCA Reservation and, as such, Comanche Nation's written consent was required prior to the BIA acquiring the Tsalote Allotment in trust for the FSA Tribe.  *See* Am. Compl. ¶ 61. According to Comanche Nation, because it did not provide such consent, the relevant defendants lacked authority to approve the acquisition, and their action should be set aside under the Administrative Procedure Act ("APA") as arbitrary, capricious, an abuse of discretion, and contrary to law.  *See id.* ¶¶ 63-64; 5 U.S.C. § 706(2).  The Federal Defendants seek dismissal of this claim on multiple grounds.

### A. *Rule 12(b)(1): Standing Under the Administrative Procedure Act*

Comanche Nation seeks relief on Count One under the APA, which provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

As relevant here, the APA prescribes two requirements for the Court's review:

> First, the person claiming a right to sue must identify some "agency action" that affects him in the specified fashion; it is judicial review "thereof" to which he is entitled. . . . . When . . . review is sought . . . only under the

---

[3] "[I]n the State of Oklahoma wherever historic reservations have not yet been reaffirmed, or where there has been a final judicial determination that a reservation has been disestablished or diminished, Indian reservation means the area of land constituting the former reservation of the Tribe as defined by the Secretary."  25 C.F.R. § 151.2.

general review provisions of the APA, the "agency action" in question must be "final agency action."

Second, the party seeking review under § 702 must show that he has "suffered legal wrong" because of the challenged agency action, or is "adversely affected or aggrieved" by that action "within the meaning of a relevant statute."

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (alteration omitted) (citing 5 U.S.C. §§ 551(13), 702, 704); *see also Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000) ("Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13).").

An agency action includes "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Two conditions generally must be met for an agency's action to be "final" under the APA: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (internal quotation marks omitted). The Federal Defendants do not directly dispute that the BIA's alleged 2001 acquisition of the Tsalote Allotment in trust for the FSA Tribe without obtaining the consent of Comanche Nation constitutes a final agency action otherwise subject to review under the APA. *See* Fed. Defs.' Suppl. Mot. at 28; *see, e.g.*, *South Dakota v. U.S. Dep't of Interior*, 775 F. Supp. 2d 1129, 1141-46 (D.S.D. 2011) (determining whether BIA's taking of land into trust for a tribe was arbitrary and capricious under the APA).

"[T]o be adversely affected or aggrieved within the meaning of a statute, the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S. at 883 (omission and internal quotation marks omitted). The Federal Defendants challenge Comanche Nation's showing on this requirement, asserting that Comanche Nation has failed to "claim[] to be 'adversely affected or aggrieved.'" *Donelson v. U.S. ex rel. Dep't of Interior*, 730 F. App'x 597, 602 (10th Cir. 2018) (quoting 5 U.S.C. § 702)); *see* Fed. Defs.' Suppl. Mot. to Dismiss at 27. The Federal Defendants only superficially develop this argument, and, in any event, the Amended Complaint specifically alleges that the 2001 transaction "has caused some injury to" Comanche Nation, including in the form of lost revenues. *Donelson*, 730 F. App'x at 602; *see, e.g.*, Am. Compl. ¶¶ 59, 65. Such financial harm plausibly "falls within the zone of interests to be protected or regulated" by the consent requirement of 25 C.F.R. § 151.7. *Donelson*, 730 F. App'x at 601 n.1; *cf. Cherokee Nation v. U.S. Dep't of Interior*, 643 F. Supp. 3d 90, 114 (D.D.C. 2022) (noting that a tribe seeking to set aside another tribe's gaming compact "ha[d] a trump card" in that it could refuse to consent to the acquisition of land within its territory to prevent the other tribe from obtaining the land).

The Court therefore denies dismissal on this basis. *Cf. McAlpine v. United States*, 112 F.3d 1429, 1435 (10th Cir. 1997) ("[T]he Secretary's decision regarding trust land acquisitions is the type of administrative agency action over which the federal courts have traditionally exercised reviewing authority under the APA.").

### B.  *Rule 12(b)(1): Constitutional Standing*

The Federal Defendants next argue that Comanche Nation lacks standing to sue under Article III of the U.S. Constitution.  *See* Fed. Defs.' Suppl. Mot. to Dismiss at 13-16.

"Article III of the United States Constitution only extends federal judicial power to cases or controversies." *United States v. Meyers*, 200 F.3d 715, 718 (10th Cir. 2000). "Article III standing is a jurisdictional requirement for a plaintiff to plead and prove, and a lack of standing may be challenged by a motion under Rule 12(b)(1)."  *Altstatt v. Bd. of Cnty. Comm'rs for Okla. Cnty.*, No. CIV-22-811-D, 2023 WL 6208550, at *2 (W.D. Okla. Sept. 22, 2023); *see also U.S. ex rel. Stone*, 282 F.3d at 797.   When considering whether Article III standing is established, a federal court "must assume plaintiff's claim has legal validity."  *Awad v. Ziriax*, 754 F. Supp. 2d 1298, 1303 (W.D. Okla. 2010) (citing *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006)); *accord Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 841 (10th Cir. 2019) (noting that a party "need not prove the merits of [its] claim in order to establish standing").   At the pleading stage, a plaintiff's burden in establishing standing is "lightened considerably." *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012).

To have standing to sue, a plaintiff must properly allege: (1) it "ha[s] suffered an injury in fact—an invasion of a legally protected interest"—"that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted); *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008).

### 1.  Injury in Fact

To satisfy the injury-in-fact requirement for Article III standing, a party must allege that the injury is "concrete and particularized and actual and imminent, not conjectural or hypothetical."  *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229 (10th Cir. 2021) (internal quotation marks omitted).   An injury is concrete where it is a "real," not abstract, harm to a legally protected interest and is particularized where it affects a party "in a personal and individual way."   *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted).   A real injury can be tangible, such as a physical or monetary harm, or it can be intangible, such as a reputational harm.   *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

The Federal Defendants contend that Comanche Nation fails to demonstrate an injury in fact arising from the alleged failure to comply with the consent requirement of 25 C.F.R. § 151.7.   First, the Federal Defendants argue that the regulatory requirement that "the governing body of the Tribe having jurisdiction over such reservation" must consent to the acquisition of land in trust status on that reservation is inapplicable to Comanche Nation because Comanche Nation does not plead that it has jurisdiction over the Tsalote Allotment.   25 C.F.R. § 151.7; *see* Fed. Defs.' Suppl. Mot. to Dismiss at 14-15.   The Court agrees with Comanche Nation that this argument "is an attempt to rewrite the applicable regulation[]."   Pl.'s Suppl. Resp. at 15.   Section 151.7 requires the consent of

10

tribes having jurisdiction over a "reservation," not jurisdiction over the particular tract of land being acquired.   Comanche Nation has sufficiently alleged that it has jurisdiction over the KCA Reservation.   *See* Am. Compl. ¶¶ 22, 40, 76.

Further, to the extent this argument conflates the justiciability of Comanche Nation's claim on Count One with its ability to prove the Federal Defendants' liability on that claim, "at the outset of the case it is enough to *allege* the facts . . . establishing standing. If the allegations are . . . challenged, then the facts have to be litigated[.]"   *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1184 (10th Cir. 2015); *see also Cherokee Nation*, 643 F. Supp. 3d at 104 (explaining that at the pleading stage the plaintiff was "protected from an evidentiary attack on [its] asserted theory of injury" (internal quotation marks omitted)).   In this facial challenge, the Court "assumes the validity of the plaintiff's interpretation of statutes or regulations governing the claim."   *Cherokee Nation*, 643 F. Supp. 3d at 107; *accord Awad*, 754 F. Supp. 2d at 1303; *Dine Citizens Against Ruining Our Env't*, 923 F.3d at 841.

Second, the Federal Defendants object that Comanche Nation fails to show a concrete and particularized injury associated with the Federal Defendants' failure to obtain Comanche Nation's consent under 25 C.F.R. § 151.7.   *See* Fed. Defs.' Suppl. Mot. to Dismiss at 16; Fed. Defs.' Suppl. Reply at 2-3.   Comanche Nation specifically pleads, however, that the unlawful transfer of the Tsalote Allotment has permitted the unlawful opening and operation by the FSA Tribe of the Warm Springs Casino, which "is diverting revenue from [Comanche Nation's] casinos" and "reducing revenue available for government programs."   Am. Compl. ¶ 59.   "For standing purposes, a loss of even a small

11

amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).  And these allegations "are firmly rooted in the basic laws of economics that [Comanche Nation] would get a little more . . . gaming business at its Oklahoma casinos if the [FSA Tribe's] Oklahoma casinos did not conduct . . . gaming." *Cherokee Nation*, 643 F. Supp. 3d at 109 (internal quotation marks omitted).  At this pleading stage, "general factual allegations of injury resulting from the [defendants'] conduct may suffice," for the Court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013) (internal quotation marks omitted).

For these reasons, Comanche Nation has shown an injury in fact as to Count One sufficient to demonstrate Article III standing.

### 2. Causation

"Article III's causation requirement demands something less than the concept of proximate cause," but it does "require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (internal quotation marks omitted).  In other words, a plaintiff must show that its injury is "fairly traceable to the challenged action." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

To show an injury that is fairly traceable to the challenged conduct,

> a plaintiff must establish that its injury was not the result of the independent action of some third party not before the court.  This showing, however, does not require a plaintiff to establish that the defendant was the proximate cause of its injury.  Nor does it require a showing that a defendant's actions are the very last step in the chain of causation.  Rather, at the motion to

> dismiss stage, a plaintiff can satisfy the "fairly traceable" requirement by advancing allegations which, if proven, allow for the conclusion that the challenged conduct is a "but for" cause of the injury.

*Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 814 (10th Cir. 2021) (citations and internal quotation marks omitted).

The Federal Defendants challenge Comanche Nation's ability to show that any injury caused by the operation of the Warm Springs Casino is "fairly traceable" to the claimed deprivation of Comanche Nation's right of consent under 25 C.F.R. § 151.7. The Federal Defendants object that it is the FSA Tribe's operation of the casino, not the Federal Defendants' alleged violation of the regulation, that is causing the diverted revenue and the injury to Comanche Nation. Relatedly, the Federal Defendants argue that Comanche Nation did not suffer any injury until the casino opened in 2022 and that the FSA Tribe's initiation of gaming, rather than the 2001 transfer of the Tsalote Allotment, is the injurious conduct. Thus, according to the Federal Defendants, Comanche Nation's claimed injury "is too far attenuated from the alleged procedural violation" to constitute an injury in fact on Claim One. Fed. Defs.' Suppl. Mot. at 16, 21-23. Comanche Nation responds that, to the contrary, the Federal Defendants have "contributed to" its injury, as "[w]ithout the Federal Defendants, the [FSA Tribe] could not be operating the Warm Springs Casino." Pl.'s Suppl. Resp. at 24.

The U.S. District Court for the District of Columbia held, in addressing a challenge to traceability where the injuries asserted by the plaintiffs "ar[ose], not directly from the challenged act of placing the land in trust, but rather from the intended use of the land [for a casino] by the Pokagon [Band of Potawatomi Indians], who are not before the court":

> The necessary linkage is easy to identify . . . . [the plaintiffs'] injuries due to operation of the casino are traceable to the [BIA's] actions, because the taking of the site in trust is a necessary prerequisite to both Class II and III gaming and because taking the land into trust would give the Pokagon authority to compel the State of Michigan to negotiate over Class III gaming. These factors . . . establish that the individual [plaintiffs'] injuries would be "fairly traceable" to the defendant's actions . . . .

*TOMAC v. Norton*, 193 F. Supp. 2d 182, 188 (D.D.C. 2002) (footnote, citations, and internal quotation marks omitted).

Here, Comanche Nation similarly alleges that the improper 2001 transfer of the Tsalote Allotment underpinned the FSA Tribe's ability to initiate gaming on that land. The Court finds that Comanche Nation has shown a "substantial likelihood" that the Federal Defendants' challenged conduct in Count One is a "but for" cause of Comanche Nation's claimed injury. *Nova Health Sys.*, 416 F.3d at 1156; *Santa Fe All. for Pub. Health & Safety*, 993 F.3d at 814. Comanche Nation has sufficiently established that at least "some part of the alleged injury would not have occurred" but for the allegedly unlawful transfer of the Tsalote Allotment, as it is undisputed that "before the land acquisition challenged here, the [FSA Tribe] was not legally entitled to build and operate a casino on the . . . allotment. . . . . After the acquisition, it did." *Cherokee Nation*, 643 F. Supp. 3d at 106; *Bd. of Comm'rs of Cherokee Cnty. v. Jewel*, 956 F. Supp. 2d 116, 127 (D.D.C. 2013). "Injuries resulting from the construction and operation of the casino are therefore fairly traceable to" the challenged transfer. *Jewel*, 956 F. Supp. 2d at 127.

### 3. Redressability

The plaintiff also must "demonstrate a substantial likelihood that the relief requested will redress its injury." *Nova Health Sys.*, 416 F.3d at 1158. "The plaintiff must show

that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *Id.* In many cases, "redressability and traceability overlap as two sides of a causation coin." *Id.* at 1159. "Thus, if the defendant's challenged actions are a but for cause of the plaintiff's alleged injury, then that injury generally is likely redressable for standing purposes. Typically, redressability is absent only when the Court's decision would have no real effect on the plaintiff's injury." *Cherokee Nation*, 643 F. Supp. 3d at 106 (internal quotation marks omitted).

As relief on Count One, Comanche Nation seeks a declaratory judgment that the Tsalote Allotment is not owned by the FSA Tribe. *See* Am. Compl. ¶ 66. The Federal Defendants argue that such relief would not redress Comanche Nation's injury because, in settling its claims in this lawsuit, former plaintiff Kiowa Tribe already has consented to the FSA Tribe's operation of the Warm Springs Casino. *See* Fed. Defs.' Suppl. Mot. to Dismiss at 24-25 ("What is done is done; we cannot turn back time to obtain Comanche Nation's consent, as it claims the Federal Defendants should have done.").[4] Even assuming the Kiowa Tribe provided such consent to the FSA Tribe, the Court agrees with Comanche Nation that this is a red herring: Comanche Nation's claim is premised upon the necessity for independent consent by Comanche Nation of the allotment transfer pursuant to § 151.7, rather than any consent to operation of the Warm Springs Casino. Because "a

---

[4] The Federal Defendants do not seriously contend, however, that the Court does not have the authority to enter the declaratory judgment requested by Comanche Nation or that the FSA Tribe would continue to operate its casino in contravention of a court order. *See generally* 5 U.S.C. § 706(2) (prescribing that the reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law").

decision not to take the land in trust would prevent [the FSA Tribe] from building a casino on that site," *TOMAC*, 193 F. Supp. 2d at 188 (emphasis omitted), and Comanche Nation's "injuries stem from the operation of the casino," *Jewel*, 956 F. Supp. 2d at 128, Comanche Nation has shown that it is likely that entry of its requested declaratory relief on Count One will redress its injury.

### C. Rule 12(b)(1): Mootness

As noted, former plaintiff Kiowa Tribe has voluntarily dismissed its claims in this lawsuit with prejudice, with the relevant parties entering into a Settlement Agreement (Doc. No. 117, at 4-10). The Federal Defendants assert that Count One became moot when the Kiowa Tribe settled its claims because Kiowa Tribe thereby "consented to the transfer of jurisdiction over the Tsalote Allotment to the FSAT Defendants." Fed. Defs.' Suppl. Mot. to Dismiss at 32-33 (arguing that Kiowa Tribe's voluntary dismissal of its claims constituted a "consent of jurisdiction extinguish[ing] any potential claims attacking the 2001 land transfer").

Mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal quotation marks omitted). "The court must decide whether a case is moot as to each form of relief sought." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (internal quotation marks omitted).

> A case becomes moot—and therefore no longer a "Case" or "Controversy" for purposes of Article III—when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.

> No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation and internal quotation marks omitted).   "Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision."   *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (internal quotation marks omitted).

A claim for declaratory relief is moot "if the relief would not affect the behavior of the defendant toward the plaintiff."   *Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022) (internal quotation marks omitted).   As noted, the declaratory judgment sought by Comanche Nation would essentially void the Federal Defendants' acquisition of the allotment in trust for the FSA Tribe.   Comanche Nation is asserting its own right to notice and consent under that regulation, which is not alleged to be contingent upon any right or jurisdiction exercised by the Kiowa Tribe or another entity.   Further, even assuming the Court may consider the terms of the Kiowa Tribe's settlement for purposes of Rule 12(b)(1), those terms do not show that the injury Comanche Nation claims was caused by violation of 25 C.F.R. § 151.7 can no longer be redressed.   The Settlement Agreement merely notes the previous transfer in trust for the benefit of the FSA Tribe and acknowledges that the FSA Tribe is currently operating the Warm Springs Casino upon the disputed parcel.   *See* Settlement Agreement ¶¶ 2, 5.   The Settlement Agreement does not reference regulatory requirements or otherwise purport to provide consent from any tribe under that provision.

For all these reasons, it has not been shown that there is a lack of a "definite controversy" or that "conclusive relief" may no longer be conferred by the Court.  *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (internal quotation marks omitted).  The Kiowa Tribe's dismissal of its own claims does not render Comanche Nation's Count One moot.

### D.  Rule 12(b)(6): Untimeliness

Finally, the Federal Defendants argue that Count One must be dismissed pursuant to Rule 12(b)(6) because it was untimely filed.  *See* Fed. Defs.' Mot. to Dismiss at 18-25; *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("[I]f the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]").

### 1.  28 U.S.C. § 2401(a)

The timeliness of Count One is governed by 28 U.S.C. § 2401(a), "which establishes a six-year statute of limitations for nontort claims against the government."  *Chance v. Zinke*, 898 F.3d 1025, 1028 (10th. 2018).

> Section 2401(a) provides in pertinent part that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  This six-year limitations period applies to claims arising under the APA, *see, Wind River Mining Corp. v. United States*, 946 F.2d 710, 712-13 (9th Cir.1991), and it also applies to equitable as well as legal claims, *see, Christensen v. United States*, 755 F.2d 705, 708 (9th Cir. 1985), *cert. denied*, 476 U.S. 1181 (1986).  In addition, Indian tribes are not exempt from § 2401(a)'s application.  *Sisseton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir.), *cert. denied*, 498 U.S. 824 (1990).

> Courts have concluded that a cause of action "first accrues" for purposes of § 2401(a) "'when all the events have occurred which fix the alleged

liability of the United States and entitle the claimant to institute an action.'" *United States v. Sams*, 521 F.2d 421, 429 (3d Cir.1975) (quoting *Japanese War Notes Claimants Ass'n of Phil., Inc. v. United States*, 178 Ct. Cl. 630, 373 F.2d 356, 358 (1967), *cert. denied*, 389 U.S. 971 (1967)).

*Comanche Nation*, 393 F. Supp. 2d at 1208 (citations omitted); *see also Ute Distrib. Corp.*

*v. Sec'y of Interior*, 584 F.3d 1275, 1282 (10th Cir. 2009).

### 2. *Equitable Tolling*

Comanche Nation concedes that the allegedly improper June 26, 2001 acquisition of the Tsalote Allotment, which "fix[e]d the alleged liability" of the Federal Defendants and entitled Comanche Nation to sue, was recorded with the BIA on July 24, 2001. *Comanche Nation*, 393 F. Supp. 2d at 1208; *see* Am. Compl. ¶ 67. Comanche Nation argues, however, that the instant challenge to that acquisition should not be deemed time barred under § 2401(a), despite this lawsuit not being initiated until May 24, 2022, because of the applicability of equitable tolling. *See* Am. Compl. ¶¶ 67-74; Pl.'s Resp. at 8-9, 16-22.[5]

In support of this defense, Comanche Nation points to correspondence with BIA that took place in 2001 and 2002. *See* Am. Compl. ¶¶ 70-73; Pl.'s Resp. at 17-18. On June 4, 2001, the BIA solicited comments from the Kiowa Tribe, Comanche Nation, and the Apache Tribe on the proposed transfer of the Tsalote Allotment. *See* Am. Compl. ¶

---

[5] Although the Amended Complaint also cites "equitable estoppel" and "fraudulent concealment," Comanche Nation's Response fails to address the Federal Defendants' argument that these doctrines should not be applied to save Count One. In any event, the pleading does not plausibly reflect "affirmative misconduct" or "active deception" by the Federal Defendants and so does not reasonably support tolling on either basis. *In re DePaolo*, 45 F.3d 373, 377 (10th Cir. 1995); *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994).

70; Pl.'s Resp. at 17.   This invitation "falsely" stated that "[t]he determination to acquire or not [acquire] this property in trust will be made in the exercise of the Secretary of [the] Interior's discretionary authority" and gave the recipient 10 days to submit comments. Am. Compl. ¶ 70 (citing Doc. No. 18-3).

The Chairman of the Kiowa, Comanche, and Apache Intertribal Land Use Committee responded asking for more time to submit comments, as did the Apache Tribe writing separately.   *Id.* ¶ 71 (citing Doc. No. 18-4).   The BIA denied the requests, responding "with the false statement that its prior letters were 'courtesy letters'" and stating that the sale "will be approved when all the casework is completed."   *Id.* (citing Doc. No. 18-5).   The transfer was then effected and recorded with the BIA.   *See id.* ¶¶ 46, 67.

About a year later, on June 26, 2002, the tax administrator for former plaintiff Kiowa Tribe sent a letter to the BIA seeking clarification on whether the land "remains in Kiowa trust."   *Id.* ¶ 73 (citing Doc. No. 18-7).   The BIA responded by letter dated July 18, 2002, that the Tsalote Allotment "is now held by the United States of America for and on behalf of the [FSA Tribe] and is now considered a Tribal Tract under their jurisdiction."   Doc. No. 18-7, at 1; *see* Am. Compl. ¶ 73.

Equitable tolling generally "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action."   *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014).

> Equitable tolling is granted sparingly.   And whether to grant equitable tolling is a discretionary matter for the district court.   According to long-settled equitable-tolling principles, generally, a litigant seeking equitable

> tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way.

*Chance*, 898 F.3d at 1034 (alterations, citations, and internal quotation marks omitted).[6]

"[T]he diligence prong . . . covers those affairs within the litigant's control; the extraordinary-circumstances prong, by contrast, is meant to cover matters outside its control."   *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 257 (2016).

Comanche Nation contends that it has shown a diligent pursuit of its rights based upon the correspondence summarized above.   Even construed in Comanche Nation's favor, this correspondence does not show a diligent effort to pursue Comanche Nation's rights under 25 C.F.R. § 151.7.   Rather, it reflects that actual notice of the intended transfer was given by the BIA and that a few general inquiries were then made by tribal officials— at least some of whom were not associated with Comanche Nation.   These inquiries were not renewed by any kind of grievance, demand, or litigation for approximately 20 years. *See* Am. Compl. ¶ 74.[7]   Comanche Nation's failure to "diligently research the existence of a possible claim" under § 151.7 until 2022 supports only a finding of "excusable neglect" and does not provide a basis to apply equitable tolling.   *Farhat v United States*, No. 21-

---

[6] Although Comanche Nation cites *Chance* for the proposition that "§ 2401(a) . . . is subject to equitable tolling," the Tenth Circuit decision only "assume[d] without deciding" that the statutory limitations period could be tolled.   Pl.'s Resp. at 16; *Chance*, 898 F.3d at 1034 n.6.   This Court assumes likewise.

[7] Comanche Nation's pleading of these letters undercuts any suggestion that Comanche Nation was unaware of the transfer and is entirely consistent with the Court's prior finding that "Plaintiffs learned of the transfer of the Tsalote Allotment on or before the date the transfer was recorded in July of 2001, or by July 2002 at the latest."   Order of June 3, 2022, at 7; *see also Comanche Nation*, 393 F. Supp. 2d at 1201, 1208-09.

7061, 2022 WL 2840483, at *2, *3, *5 (10th Cir. 2022); *see* Am. Compl. ¶ 74.

Neither has there been an adequate showing that extraordinary circumstances stood in the way of Comanche Nation seeking relief. *See Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1246 (10th Cir. 2012) ("We have held that tolling is appropriate . . . where a plaintiff has been lulled into inaction by a defendant, and . . . , if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights." (internal quotation marks omitted)). The BIA's initial solicitation letter cited "Title 25, Code of Federal Regulations, Part 151" and invited comments from the recipients. Doc. No. 18-3, at 1. Although Comanche Nation asserts that the BIA misled the tribes and "concealed" the consent requirement of § 151.7, leading Comanche Nation to "believe[] that there was nothing that could be done to stop or challenge the transfer," for several reasons these accusations are not plausibly borne out by the pleading and the correspondence incorporated therein. Am. Compl. ¶ 70; Pl.'s Resp. at 8.

First, the Court rejects Comanche Nation's suggestion that its delay was warranted because "[a]t time of the transfer, the [FSA Tribe] gave no indication it was intending to use the parcel for gaming." Pl.'s Resp. at 18-19. Comanche Nation's representation that before gaming was contemplated a "challeng[e] to the transfer would have been a waste of resources" does not establish any extraordinary circumstance preventing an assertion of its purported rights under 25 C.F.R. § 151.7. *Id.* at 19; *see Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362, 1365-66 (9th Cir. 1990) ("The only injury required for the statutory period to commence was that incurred by all persons when, in 1964 and 1965, the amount of land available for mining claims was decreased.").

Next, Comanche Nation points to prior litigation regarding the KCA Reservation as "lull[ing]" Comanche Nation into believing that the FSA Tribe would not conduct gaming on the Tsalote Allotment.   Pl.'s Resp. at 19.   As a threshold matter, the cited litigation did not address the ownership or jurisdiction of the Tsalote Allotment.   *See Comanche Nation*, 393 F. Supp. 2d at 1200-01.   Moreover, "mistaken reliance" or a "belief that presentment was futile" are not obstacles beyond a litigant's control.   *Menominee Indian Tribe of Wis.*, 577 U.S. at 257-58.   "[T]he fact that there may have been significant risk and expense associated with presenting and litigating its claims is far from extraordinary."   *Id.* at 258. And while Comanche Nation emphasizes the BIA's status as its "fiduciar[y]," the "general trust relationship between the United States and the Indian tribes" "does not override the clear language" of federal statutes.   Pl.'s Resp. at 20; *Menominee Indian Tribe of Wis.*, 577 U.S. at 258-59 (internal quotation marks omitted); *cf. Pelt v. Utah*, 611 F. Supp. 2d 1267, 1282 (D. Utah 2009) (explaining that trust-based claims against the United States are subject to the six-year statute of limitations in § 2401(a)).

In summary, Comanche Nation does not plausibly allege facts to support the application of equitable tolling and, therefore, Count One must be dismissed as untimely pursuant to 28 U.S.C. § 2401(a) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

V.    *Count Two: Violation of the First Treaty of Medicine Lodge*

In Count Two, Comanche Nation claims pursuant to federal common law that Defendants DOI, Newland, and LaCounte are liable for violation of the First Treaty of Medicine Lodge ("First Treaty"), 15 Stat. 581 (1867); *see Oneida Cnty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 234-36 (1985) (discussing tribal members' use of "a

common-law action to vindicate their aboriginal rights").   Comanche Nation alleges that the First Treaty "reserved to the Kiowa Tribe and Comanche Nation the KCA Reservation, and specifically provided that the reservation would be for their exclusive use and occupation unless these tribes consented to another tribe sharing the reservation."   Am. Compl. ¶ 76.   "With the sole exception of the Apache Tribe, the Kiowa Tribe and Comanche Nation have not consented to share or admit upon the KCA Reservation any other tribe."   *Id.*   Therefore, Comanche Nation alleges, the transfer of "ownership and jurisdiction over the Tsalote Allotment required the consent of the Kiowa Tribe and Comanche Nation," and the Federal Defendants' failure to obtain that consent violated the First Treaty.   *Id.* ¶ 77.   Comanche Nation seeks declaratory and injunctive relief to compensate for the resulting "intangible harms to [its] self-determination, sovereignty, and government."   *Id.* ¶ 79.

### A. *Rule 12(b)(1): Sovereign Immunity*

The Federal Defendants first assert that they are immune from suit on Count Two and that Comanche Nation has failed to plead any waiver of this sovereign immunity that would allow its common-law treaty claim to proceed.   Fed. Defs.' Mot. to Dismiss at 26-27; Fed. Defs.' Suppl. Mot. to Dismiss at 18.

"Sovereign immunity generally shields the United States, its agencies, and its officers acting in their official capacity from suit."   *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1295 (10th Cir. 2009); *see also Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983) ("[T]he United States cannot be sued at all without the consent of Congress.").   Where applicable, the defense of

sovereign immunity deprives the Court of subject-matter jurisdiction; it "may properly be asserted by a motion to dismiss under Rule 12(b)(1)." *White v. United States*, No. CIV-16-1265-D, 2017 WL 4681796, at *2 (W.D. Okla. Oct. 17, 2017). "[A] party seeking to assert a claim against the government . . . must . . . point to a specific waiver of immunity in order to establish jurisdiction." *Normandy Apartments*, 554 F.3d at 1295.

As a federal agency and officials of the United States Government, the Federal Defendants are plainly entitled to sovereign immunity. *See id.* The Amended Complaint does not address the Federal Defendants' sovereign immunity or articulate a basis for the Court to find a waiver of this immunity. The Federal Defendants, however, affirmatively point the Court to the APA's waiver of sovereign immunity, which "waive[s] sovereign immunity in most suits for nonmonetary relief," as a possible basis to allow Count Two to be considered. *Simmat v U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005); *see* Fed. Defs.' Mot. to Dismiss at 27 (citing 5 U.S.C. 702). "This waiver is not limited to suits under the [APA]." *Simmat*, 413 F.3d at 1233. Comanche Nation's Response likewise cites § 702 as a basis for waiver. *See* Pl.'s Resp. at 25 n.17.[8]

Because Count Two seeks "relief other than money damages," and Comanche Nation's claim has not been shown to be otherwise precluded, it has been adequately established at this stage that the APA waives the Federal Defendants' sovereign immunity and allows consideration of this claim. 5 U.S.C. § 702.

---

[8] Comanche Nation primarily argues that the Court has "mandamus jurisdiction" over Count Two under 28 U.S.C. § 1361. Pl.'s Resp. at 23-24. Count Two does not seek issuance of a writ of mandamus, however, and the Response does not explain how § 1361 conceivably would apply to a claimed treaty violation.

B.  *Rule 12(b)(1): Standing*

The Federal Defendants contend that Comanche Nation has not met its burden to establish Article III standing with regard to Claim Two.  Fed. Defs.' Suppl. Mot. to Dismiss at 17-18, 21-23, 25-26.

Comanche Nation alleges that the BIA Defendants are liable for their violation of Article 2 of the First Treaty, which was signed in 1867.  This provision set forth the geographic boundaries of the KCA Reservation and then prescribed that this land

> *shall be and the same is hereby set apart for the absolute and undisturbed use and occupation of the tribes herein named, and for such other friendly tribes or individual Indians as, from time to time, they may be willing (with the consent of the United States) to admit among them*; and the United States now solemnly agrees that no persons except those herein authorized so to do and except such officers, agents, and employees of the Government as may be authorized to enter upon Indian reservation in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article, or in such territory as may be added to this reservation, for the use of said Indians.

First Treaty art. 2, 15 Stat. at 582 (emphasis added) (editor's mark omitted).

"On October 6, 1892, the United States negotiated an agreement with the Kiowa Tribe, Comanche Nation, and Apache Tribe for the allotment of lands of the KCA Reservation to individual members of the three tribes.  This was known as the Jerome Agreement."  *Comanche Nation*, 393 F. Supp. 2d at 1200.  "Pursuant to the Jerome Agreement, the United States acquired a substantial portion of the KCA Reservation and allotted individual tracts of land to the individual members of the three tribes."  *Id.* at 1200-01.

In 1900, Congress ratified the Jerome Agreement, proclaiming:

> Subject to the allotment of land, in severalty to the individual members of the Comanche, Kiowa, and Apache tribes of Indians in the Indian Territory, as hereinafter provided for, and subject to the setting apart as grazing lands for said Indians, four hundred eighty thousand acres of land as hereinafter provided for, and subject to the conditions hereinafter imposed, and for the considerations hereinafter mentioned, the said Comanche, Kiowa, and Apache Indians hereby cede, convey, transfer, relinquish, and surrender, forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest, of every kind and character, in and to the lands embraced in the [KCA Reservation].

Act of June 6, 1900 ("1900 Act"), art. I, ch. 813, 31 Stat. 676, 676-77 (1900).

Citing the 1900 Act, the Federal Defendants argue that Comanche Nation fails to allege an injury in fact on this claim because the cited terms of the First Treaty "are now abrogated." Fed. Defs.' Suppl. Mot. to Dismiss at 17. Specifically, they contend that the tribes' right to absolute and undisturbed use and occupation was abrogated when the KCA reservation was disestablished in 1900. *See id.*; Fed. Defs.' Suppl. Reply at 4-5. Comanche Nation, they say, therefore may not seek relief for any purported infringement upon that right as to the lands embraced in the former KCA Reservation. *See* Fed. Defs.' Suppl. Reply at 5.

Comanche Nation does not dispute that such abrogation would deprive it of standing but argues that it may still enforce this treaty right, as the 1900 Act was enacted to open the KCA Reservation "to settlement on fee lands by non-Indians" and such a purpose "is entirely distinct from permitting a new Indian tribe to acquire jurisdiction over a reservation and conduct gaming on Indian land there." Pl.'s Suppl. Resp. at 19; *see id.* at 20 ("Nothing . . . in the 1900 Act expresses an intent by Congress to allow a foreign Indian tribe to acquire jurisdiction within the KCA Reservation.").

Authorities cited by the Federal Defendants persuasively establish, however, that the rights Comanche Nation attempts to now enforce are inconsistent with the effect of the 1900 Act and so must have been extinguished by that legislation.   It is now well established that in the 1900 Act, Congress "intended to dissolve the tribal government" and "disestablish the organized reservation."   *Tooisgah v. United States*, 186 F.2d 93, 97-98 (10th Cir. 1950); *accord Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1421 (10th Cir. 1990); *In re Yates*, 349 P.2d 45, 47 (Okla. Crim. App. 1960).   It is further established that Congress "did so" disestablish the KCA Reservation via the 1900 Act. *Martinez v. State*, 502 P.3d 1115, 1120 (Okla. Crim. App. 2021).   Whatever additional purposes of Congress may have been possible, Comanche Nation fails to show how the tribes' First Treaty right to "absolute and undisturbed use and occupation" of the land within the former reservation can reasonably still be intact after those tribes agreed to "cede, convey, transfer, relinquish, and surrender, *forever and absolutely*, *without any reservation whatever*, express or implied, all their claim, title, and interest, of every kind and character, in and to" that same land.   First Treaty art. 2; 1900 Act art. I (emphasis added); *cf. Tooisgah*, 186 F.2d at 99 (noting that with the 1900 Act "the reservation was dissolved and tribal government broken up"); *Martinez*, 502 P.3d at 1119 (explaining that the 1900 Act confirmed "complete . . . surrender of all tribal claims to their reservation lands").   *See generally McGirt v. Oklahoma*, 591 U.S. 894, 904 (2020) (noting that Congress commonly expresses its intent to disestablish a reservation through "language evidencing the present and total surrender of all tribal interests" (internal quotation marks omitted)).

Comanche Nation alternatively asserts that the 1900 Act "does not apply at all to the Tsalote Allotment." Pl.'s Suppl. Resp. at 20. Specifically, Comanche Nation points to the text of the 1900 Act prescribing that the surrender of the tribes' interest in the land was made "[s]ubject to the allotment of land, in severalty to the individual members of the Comanche, Kiowa, and Apache tribes of Indians in the Indian Territory." 1900 Act art. I. Because the Tsalote Allotment is one of the referenced allotments in severalty, argues Comanche Nation, "the 1900 Act cannot have abrogated the Comanche Nation's treaty right to consent to another Indian tribe (other than the Kiowa or Apache tribes) acquiring that allotment." Pl.'s Suppl. Resp. at 20.

Beyond quoting the "[s]ubject to" language, Comanche Nation offers no authority for the conclusion that the Tsalote Allotment is "outside the scope" of the 1900 Act, and the Court finds that Comanche Nation's position does not align with a reasonable reading of the 1900 Act or relevant case authority. As noted above, the Tsalote Allotment was allotted in 1901 to a Kiowa tribal member. *See* Am. Compl. ¶ 28. Article II of the 1900 Act prescribed that such an allotment was part of, and included in, the lands over which the tribes were relinquishing their interest:

> Out of the lands ceded, conveyed, transferred, relinquished, and surrendered by Article I hereof, and in part consideration for the cession thereof, it is agreed by the United States that each member of said Comanche, Kiowa, and Apache tribes of Indians over the age of eighteen (18) years shall have the right to select for himself or herself one hundred and sixty (160) acres of land to be held and owned in severalty, to conform to the legal surveys in boundary[.]

1900 Act art. II.

The quoted text makes clear that allotments such as the Tsalote Allotment were

selected "*out of* the lands ceded"—i.e., the lands to which the tribes surrendered any interest in Article I—rather than lands separate from the ceded lands.   *Id.* (emphasis added); *accord Tooisgah*, 186 F.2d at 97 (explaining that "[t]he allotment of lands in severalty within the limits of [an] established reservation" would not, standing alone, disestablish the reservation or "exclude the allotments from [the reservation of which they were a part]").   And when the tribal government "dissolve[d]" pursuant to the 1900 Act, the KCA Reservation was likewise "dissolved."   *Id.* at 97, 99.   Thus, the allotments were "not considered to be retained reservation lands," as Comanche Nation suggests.   *Yazzie*, 909 F.2d at 1421; *see also United States v. Burnett*, 777 F.2d 593, 596 (10th Cir. 1985).

Comanche Nation therefore fails to show that it retains any right to seek redress for violation of the First Treaty as to the Tsalote Allotment.   Because Comanche Nation has not met its burden to establish standing on Count Two, dismissal is required pursuant to Federal Rule of Civil Procedure 12(b)(1).

### VI.     Count Six: Compelling Action Against the FSA Tribe

In Count Six, titled "Compelling NIGC Action Under the Administrative Procedures Act," Comanche Nation alleges that Defendants DOI and Avery (the "NIGC Defendants") failed to fulfil their "mandatory duty to take some action against the FSA Tribe" as to the allegedly unlawful casino operation.   Am. Compl. ¶ 141.   In support, Comanche Nation pleads that the NIGC, a commission within the Department of Interior, "was required to report the illegal operation of the Warm Springs Casino to federal law enforcement officials" pursuant to 25 U.S.C. § 2716(b) and "has failed to take this non-discretionary act."   *Id.* ¶¶ 133, 135; *see id.* ¶¶ 132-140 (claiming that the FSA Tribe's

operation of the Warm Springs Casino violates the Indian Gaming Regulatory Act ("IGRA") and that NIGC has both the authority to enforce IGRA and trust obligations to Comanche Nation).   The Amended Complaint seeks injunctive relief in the form of an order compelling these defendants "to report the Warm Springs Casino's violations of federal law to federal law enforcement officials and to take enforcement action against the FSA Tribe and Warm Springs Casino."   *Id.* ¶ 142.

The Federal Defendants challenge standing and mootness and also dispute that Count Six states a claim upon which relief can be granted.   As the constitutional standing argument has merit, the Court need not address all the other possible bases for dismissal.[9]

Comanche Nation more specifically alleges that the NIGC Defendants were required by 25 U.S.C. § 2716(b), a provision in IGRA titled "Investigative Powers," to report the "illegal operation" of the FSA Tribe's casino to federal law officials.   Am. Compl. ¶ 135.   This statute provides:

---

[9] Underpinning their jurisdictional challenges is the Federal Defendants' contention that Comanche Nation cannot state a plausible claim for relief because § 2716(b) is simply an exception to the NIGC's confidentiality mandate and that there is no basis therein to compel the NIGC to "report" allegedly illegal operations to law enforcement.   *See* Fed. Defs.' Suppl. Mot. to Dismiss at 30-32; *see also* Fed. Defs.' Suppl. Reply at 10 ("The NIGC has discretionary enforcement authority, not mandatory duties driven by complaints of rival tribes.").   The Federal Defendants' position is consistent with both the plain text of the statute and persuasive authority (as well as a lack of any case support for Comanche Nation's view of § 2716(b)).   *See, e.g.*, *Jewel*, 956 F. Supp. 2d at 124-25 ("The NIGC clearly has the authority to enforce civil penalties against those who violate IGRA.   And the Supreme Court has held that an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion and therefore is presumptively unreviewable." (citation and internal quotation marks omitted) (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985))).

**(a) Confidential information**

Except as provided in subsection (b), the [NIGC] shall preserve any and all information received pursuant to this chapter as confidential pursuant to the provisions of paragraphs (4) and (7) of section 552(b) of Title 5.

**(b) Provision to law enforcement officials**

The [NIGC] shall, when such information indicates a violation of Federal, State, or tribal statutes, ordinances, or resolutions, provide such information to the appropriate law enforcement officials.

**(c) Attorney General**

The Attorney General shall investigate activities associated with gaming authorized by this chapter which may be a violation of Federal law.

25 U.S.C. § 2716.

The Federal Defendants contest Comanche Nation's showing of redressability for Article III purposes, arguing that even if the Court were to compel the NIGC Defendants to report the casino's alleged IGRA violations to federal law enforcement, it has not been shown that such an order would redress Comanche Nation's claimed injury of lost revenue and unlawful competition owing to the Warm Springs Casino.  *See* Fed. Defs.' Suppl. Mot. to Dismiss at 26.   The Court agrees.

As pleaded and argued in the briefs, Comanche Nation's theory of recovery on this claim is as follows.   On April 27, 2022, Comanche Nation supplied the NIGC with "information indicat[ing] a violation of" IGRA in the form of a letter "complaining of the Warm Springs Casino and requesting agency action" and an April 28, 2022 supplement to that letter.   25 U.S.C. § 2716(b); Am. Compl. ¶ 51.   The NIGC acknowledged receipt of that letter but did not act to stop the opening of the casino or prevent its operation.   Am. Compl. ¶ 52.   Comanche Nation alleges that, pursuant to § 2716(b), the NIGC was required to "report the illegal operation" to federal law enforcement and "take some action

against the FSA Tribe" but failed to do so.   *Id.* ¶¶ 135, 141.   If the Court orders NIGC to make a report pursuant to § 2716(b), such order will result in enforcement of IGRA against the FSA Tribe, a declaration of illegality, the refusal of outside vendors to assist in operating the casino, and "clos[ure] [of] the casino."   Pl.'s Suppl. Resp. at 26-27.

The chain of events that must transpire for Comanche Nation to obtain relief in this manner is entirely too speculative and presupposing to establish that the Court's decision would have any "real effect" on Comanche Nation's injury.   *Cherokee Nation*, 643 F. Supp. 3d at 106.   As a starting point, the alleged proof of illegality—other than this lawsuit—is an unsolicited letter sent to the NIGC by an interested tribe.   *See* Am. Compl. ¶ 51.   Such a submission is not reasonably viewed as the type of indication of wrongdoing contemplated to be brought to the NIGC's attention in the course of carrying out its duties to monitor and inspect gaming operations.   *See United States v. Garza*, No. W-06-CR-077, 2006 WL 8436943, at *5 (W.D. Tex. Sept. 21, 2006) ("[T]he NIGC is mandated to provide information of wrongdoing to appropriate law enforcement officials when such is uncovered during any inspection.   25 U.S.C. § 2716."); *see, e.g.*, 25 U.S.C. § 2706(b) (prescribing that the NIGC shall inspect gaming premises and may audit revenue records).

Further, requiring the NIGC Defendants to provide Comanche Nation's accusations to law enforcement does not plausibly establish that the various other events would take place that would result in the closing of the Warm Springs Casino.   As noted by the Supreme Court:

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.   In that circumstance, causation and redressability ordinarily hinge

> on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Lujan*, 504 U.S. at 562 (citation and internal quotation marks omitted).

At a minimum, the Attorney General or other law enforcement official would need to take up the matter, exercise discretion to pursue it, seek Comanche Nation's preferred remedies, and be successful in doing so and thereby in closing the casino. Such conjecture fails to adequately show that "those choices . . . will be made in such manner as to . . . permit redressability." *Id.*; *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court[.]"). As Comanche Nation has not shown that the relief requested is "likely to produce [an] action" that redresses Comanche Nation's injury in fact, Comanche Nation has failed to establish standing as to Count Six. *Lujan*, 504 U.S. at 571; *cf. Cherokee Nation*, 643 F. Supp. 3d at 106 ("[R]edressability is absent when the independent action of some third party would still cause the entire injury.").

## CONCLUSION

In accordance with the foregoing, the Federal Defendants' Motion to Dismiss (Doc. No. 63) and Supplemental Motion to Dismiss (Doc. No. 124) are GRANTED as follows:

- Count One is DISMISSED without prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and

- Count Two and Count Six are DISMISSED without prejudice pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

  IT IS SO ORDERED this 30th day of September, 2024.

CHARLES B. GOODWIN
United States District Judge