**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

COMANCHE NATION,

    Plaintiff - Appellee,

v.

LORI GOODAY WARE, individually and
in her official capacity as FSAT
Chairwoman; PAMELA EAGLESHIELD,
individually and in her official capacity as
FSAT Vice-Chairman; JAMES
DEMPSEY, individually and in his official
capacity as FSAT Secretary-Treasurer;
JEANETTE MANN, individually and in
her official capacity as FSAT Committee
Member; JENNIFER HEMINOKEKY,
individually and in her official capacity as
FSAT Committee Member; DOLLY
LORETTA BUCKNER, individually and
in her official capacity as FSAT Committee
Member; PHILIP KOSZAREK,
individually and in his official capacity as
FSAGC Chairman; NAOMI HARFORD,
individually and in her official capacity as
FSAGC Vice-Chairman; MICHAEL
CRUMP, individually and in his official
capacity as FSAGC Commissioner;
LAUREN PINOLA, individually and in
her official capacity as FSAGC
Commissioner; DEBBIE BAKER,
individually and in her official capacity as
FSAGC Commissioner,

    Defendants - Appellants,

and

No. 24-6221

UNITED STATES DEPARTMENT OF
THE INTERIOR; BRYAN NEWLAND, in
his official capacity as Assistant Secretary
Indian Affairs; DARRYL LACOUNTE, in
his official capacity as Director of the
Bureau of Indian Affairs; SEQUOYAH
SIMERMEYER, in his official capacity as
Chairman of the National Indian Gaming
Commission,

      Defendants.

———————————————————

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:22-CV-00425-G)**

———————————————————

R. Daniel Carter, Foster Garvey, P.C., Tulsa, Oklahoma (Kelly A. Mennemeier and
Devra R. Cohen, Foster Garvey, P.C., Seattle, Washington, with him on the briefs) for
Defendants-Appellants.

Wilson Pipestem, Pipestem Law, P.C., Tulsa, Oklahoma (Harvey D. Ellis, Crowe &
Dunlevy, PC, Oklahoma City, Oklahoma, and D. Michael McBride III, Randall J. Yates,
and Logan C. Hibbs, Crowe & Dunlevy, P.C., Tulsa, Oklahoma, on the brief) for
Plaintiff-Appellee.

———————————————————

Before **HARTZ**, **TYMKOVICH**, and **BACHARACH**, Circuit Judges.

———————————————————

**TYMKOVICH**, Circuit Judge.

———————————————————

The Fort Sill Apache Tribe opened the Warm Springs Casino near Lawton,

Oklahoma in 2022.  Several miles away, the Comanche Nation operates its own

casinos—the Spur Casino and the Comanche Casino.  The resulting competition

made the Nation's casinos less profitable.  Contending the Warm Springs Casino was

opened in violation of federal law, the Comanche Nation sued officials of the Fort Sill Apache Tribe to enjoin operation of the casino. The Nation also seeks monetary damages against the defendants in their individual capacities.

The Officials moved to dismiss the claims, raising tribal sovereign immunity. The district court denied that motion to dismiss. The Officials appealed that ruling as an immediately appealable order under the collateral-order doctrine.

Exercising our jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** in part and **REVERSE** in part. We conclude that the Indian Gaming Regulatory Act (IGRA) abrogates the Tribe's sovereign immunity defense, so the Nation can proceed with its official-capacity claims under IGRA. But as to the official-capacity claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), we conclude that the Officials are entitled to tribal immunity. As to the individual-capacity claims under RICO, because we conclude that the Officials are the real parties in interest on the damages claim, they are not entitled to raise tribal immunity.

## I.    Background

In 2022, the Fort Sill Apache Tribe opened the Warm Springs Casino, which is located a few dozen miles from one of the Nation's casinos. App. Vol. 2 at 18–19. The Warm Springs Casino sits on a plot of land that the parties call the Tsalote Allotment, which the Fort Sill Apache Tribe acquired in 2001. The Tsalote Allotment is in the area formerly reserved to the Kiowa Tribe, Comanche Nation, and

Apache Tribe.[1]  But after Congress passed the General Allotment Act of 1887

(Dawes Act), ch. 119, 24 Stat. 388, the United States obtained much of the

reservation's land and began allotting that land to individual claimants.[2]  The United

States allotted one of those parcels to George Tsalote, a member of the Kiowa Tribe.

After the Fort Sill Apache Tribe acquired the Tsalote Allotment, the Bureau of

Indian Affairs deeded the land in trust for the Tribe, and the Tribe entered a gaming

compact with Oklahoma in 2005, but waited until 2022 to open Warm Springs.

The Nation sued for damages and an injunction halting operation of the Warm

Springs Casino.[3]  The Nation named two groups of defendants: members of the

Tribe's governing board and members of the Tribe's gaming commission.[4]  The

Nation sought injunctive and declaratory relief under IGRA and RICO against the

---

[1] This refers to the Apache Tribe of Oklahoma, a tribe distinct from (though related to) the Fort Sill Apache Tribe.  *See* App. Vol. 2 at 12–13.

[2] The United States obtained this land through the Jerome Agreement, ch. 31 Stat. 676 (1900), signed in 1892 and ratified in 1900.  This disestablished the KCA reservation.  *Tooisgah v. United States*, 186 F.2d 93, 97–98 (10th Cir. 1950).

[3] The Kiowa Tribe also joined the suit but has voluntarily dismissed its suit. App. Vol. 3 at 146.

[4] The Nation also brought claims against various federal defendants—the Assistant Secretary for Indian Affairs, the Director of the Bureau of Indian Affairs, and the Chairman of the National Indian Gaming Commission.  The district court dismissed these defendants.  *See* App. Vol. 3 at 233–34.

Officials in their official capacities,[5] and damages under RICO in their individual capacities.

The Officials moved to dismiss the IGRA and RICO claims. As for the IGRA claim, the Officials argued that the Nation failed to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6) and failed to join a required party under Rule 12(b)(7). Relevant here, the Officials argued that the Tribe is a party required to be joined in the suit but could not be joined because the Tribe's sovereign immunity protects it—and its officials—from suit. The court rejected that argument, finding that the Tribe was not a required party since the Officials had been sued in their official capacities. App. Vol. III at 249–50. The Officials made a similar argument on the RICO claim. Invoking Rule 12(b)(6), they contended that tribal immunity immunizes the Officials from suit, so that the official-capacity RICO claim must fail. The court explicitly rejected the tribal-immunity argument on the RICO claim. App. Vol. 3 at 252.

The Officials interlocutorily appealed under the collateral-order doctrine. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47 (1949).

## II.    Discussion

The Officials contend they are protected by tribal sovereign immunity on the official-capacity claims under IGRA and RICO. They also argue that they are entitled to tribal immunity on the individual-capacity RICO claims because the Tribe

---

[5] The district court dismissed the Nation's other claim alleging a violation of the First Treaty of Medicine Lodge. *See* App. Vol. 3 at 256–57.

is the real party in interest.  The Nation counters that (1) IGRA abrogates tribal immunity, (2) the RICO claim seeks injunctive relief against enforcement officials, which displaces tribal immunity under *Ex Parte Young*, 209 U.S. 123 (1908), and (3) the individual defendants are the real parties in interest, so they cannot raise the Tribe's immunity as a defense.

As we explain, we agree with the Nation that IGRA abrogates tribal immunity on the IGRA claim and that the individuals are the real parties in interest.  But we agree with the Officials that *Ex Parte Young* does not displace tribal immunity on the RICO claim.

### A.    *Collateral-Order Jurisdiction*

Before reaching the parties' arguments, we have an obligation to ensure our jurisdiction over the case before us.  *Shields Law Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1279 (10th Cir. 2024).  Our jurisdiction over final decisions from the district courts flows through 28 U.S.C. § 1291.  *See* § 1291 (conferring jurisdiction over "appeals from all final decisions of the district court").  As a general matter, a decision is final—and thus appealable—only when it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Ray v. Haluch Gravel Co. v. Cent. Pension Fund*, 571 U.S. 177, 183 (2014) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)).

But we may exercise interlocutory review over a special category of orders— eligible collateral orders—despite the absence of a litigation-ending decision.  *Will v. Hallock*, 546 U.S. 345, 349 (2006) (characterizing the doctrine "not as an exception

to the final decision rule laid down by Congress in § 1291, but as a practical construction of it").  Under the collateral-order doctrine, we may review an order that "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits, and (3) [is] effectively unreviewable on appeal from a final judgment."  *KCOM, Inc. v. Emp'rs Mut. Cas. Co.*, 829 F.3d 1192, 1199 (10th Cir. 2016).  And though the class of orders meeting these requirements is small, *United States ex rel. Fiorisce, LLC v. Colo. Tech. Univ., Inc.*, 130 F.4th 811, 816 (10th Cir. 2025) (quoting *Cohen*, 337 U.S. at 546), an order denying tribal sovereign immunity qualifies as a collateral order.  *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1177 n.1 (10th Cir. 2010) (citing *Osage Tribal Council ex rel. Osage Tribe of Indians v. U.S. Dep't of Labor*, 187 F.3d 1179–80 (10th Cir. 1999)).

Thus, an order that *explicitly* denies tribal immunity qualifies as an immediately appealable collateral order.  *Cf. Montoya v. Vigil*, 898 F.3d 1056, 1063 (10th Cir. 2018) (explaining that "if the district court explicitly decided" the immunity issue, then "we will usually have jurisdiction over the interlocutory appeal").  But an order that *implicitly* denies tribal immunity qualifies, too.  This occurs when the defendant puts the immunity issue "clearly before" the court, and "the district court's silence" on the issue "operate[s] as an implicit denial."  *Id.*; *see also Lowe v. Town of Fairland*, 143 F.3d 1378, 1380 (10th Cir. 1998) (agreeing with

7

circuits that "conclude[] that orders failing or refusing to consider" immunity are "immediately appealable").[6]

The order here explicitly denied tribal immunity on the RICO claim and implicitly denied it on the IGRA claim. The court explicitly denied tribal immunity on the RICO claim when, in response to the Officials' tribal-immunity argument, it declined to "dismiss the claim on this basis." *See* App. Vol. 3 at 252 The court also implicitly denied immunity on the IGRA claim. The Officials brought the issue before the court by raising the immunity in their motion to dismiss. *See* App. Vol. 2 at 261 ("*Tribal officials* are immunized from suits brought against them because of their official capacities." (emphasis added)); *id.* (titling sections "THE FSAT IS IMMUNE FROM SUIT" and "The FSAT has not Waived Sovereign Immunity and the *Ex parte Young* Exception Does Not Apply"); *id.* at 262 (characterizing IGRA claim as an attempt to "circumvent the sovereign immunity of the FSAT"). And with the tribal-immunity issue before the court, the court's silence on the issue operated as an implicit denial of the Officials' sovereign immunity against the IGRA claim.[7]

---

[6] To be sure, we have applied this implicit-denial rule most commonly in the qualified-immunity context. But the rule's logic does not depend on the type of collateral order; it instead addresses what constitutes a denial of an issue that would give rise to a collateral order.

[7] We acknowledge that the Officials raised the sovereign-immunity issue in the context of a Rule 12(b)(7) argument. So we cannot fault the district court for confining itself to the required-joinder analysis. But we think the Officials' discussion of the Tribe's immunity and their assertion that tribal officials are immune from suit sufficiently put the issue before the court, so that its silence on the issue operated as an implicit denial.

Because the court's order denied tribal immunity on the IGRA and RICO claims, we have jurisdiction under the collateral-order doctrine.

### B.    Tribal Sovereign Immunity

Indian tribes exercise "inherent sovereign authority" as "domestic dependent nations." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014). And though Congress has broad legislative authority "in respect to Indian tribes," tribes remain "separate sovereigns pre-existing the Constitution." *Id.* Thus, tribes retain certain aspects of their sovereignty, one of which is sovereign immunity—the "common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978).

Tribal sovereign immunity is not limited to suits nominally against an Indian tribe itself. The immunity also extends to suits against tribal officials—like the Officials here—for claims against the officials in their *official* capacities. *Native Am. Dist. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1296 (10th Cir. 2008) ("[A] tribe's immunity generally immunizes tribal officials from claims made against them in their official capacities." (citing *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997)). That is because "relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)).

But tribal immunity does not attach to all suits. A tribe may, for example, waive its immunity from suit. *See Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1011 (10th Cir. 2007). Or Congress may abrogate the tribe's immunity by

9

statute. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387 (2023). Alternatively, a plaintiff may rely on *Ex Parte Young* to circumvent tribal immunity. *Norton v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 862 F.3d 1236, 1251 (10th Cir. 2017). As we have explained, *Ex Parte Young*, which allows a plaintiff to avoid a state's sovereign immunity for "suits against state officials seeking to enjoin alleged ongoing violations of federal law," applies equally to a tribe's sovereign immunity. *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154–55 (10th Cir. 2011).

To abrogate tribal immunity, Congress must make its intent to abrogate "unmistakably clear in the language of the statute." *Lac du Flambeau Band of Lake Superior Chippewa Indians*, 599 U.S. at 387. And under *Ex Parte Young*, a plaintiff need only "seek[] to enjoin alleged ongoing violations of federal law" by suing government officials directly. *Crowe & Dunlevy*, 640 F.3d at 1154.

Here, the Officials have invoked tribal immunity against Comanche Nation's official-capacity claims under IGRA and RICO. The Nation aims to defeat that immunity through two of the exceptions mentioned above—abrogation and *Ex Parte Young*. The Nation argues that (1) IGRA has abrogated tribal immunity on the IGRA claim, and (2) *Ex Parte Young* displaces tribal immunity on the RICO claim. We agree with the first argument but reject the second.

### 1. *Official-Capacity Claim under IGRA*

Congress enacted IGRA in 1988 to allocate authority over Indian gaming between states, tribes, and the federal government. *See Bay Mills*, 572 U.S. at 785

(explaining that IGRA "creates a framework for regulating gaming activity on Indian lands").  IGRA focuses solely on gaming operations on "Indian lands."  *See* 25 U.S.C. § 2710 (regulating class I, class II, and class III gaming "on Indian lands"); 1 Cohen's Handbook of Federal Indian Law § 16.02 (2024) ("[IGRA] governs most, but not all, gaming by Indian tribes on Indian lands in the United States.").  "Indian lands" are either "all lands within the limits of any Indian reservation" or "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or individual."  25 U.S.C. § 2703(4).[8]

IGRA provides different regulatory requirements on gaming depending on the "class" the gaming falls into.  Class I covers traditional and social games carrying minimal financial stakes; class II covers games of chance (like bingo); and class III is a residual category covering all remaining gaming.  Typical casino games and slot machines fall under class III gaming.[9]  *Bay Mills*, 572 U.S. at 792.

IGRA regulates class III most heavily and imposes an extensive framework for allocating authority between the states and tribes.  The primary feature of this framework is the tribal-state compact, without which a tribe may not operate class III gaming.  25 U.S.C. § 2710(d) (making class III gaming operations lawful only if they are "conducted in conformance with a Tribal-State Compact entered into by the

---

[8] "Indian lands" also covers lands not held in trust but "subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4)(B).

[9] The White Springs Casino also offers class II and class III gaming.

Indian tribe and the State"). This compact requirement gives a shared role to both Indian tribes and state governments in regulating gaming on Indian lands. *See* 1 Cohen's Handbook of Federal Indian Law § 16.05 (2024). These compacts usually contain provisions addressing enforcement of the compact's provisions, waivers of tribal immunity against state-initiated actions, and revenue-sharing provisions. *Id.* Another common clause, relevant to this case, is one that specifies where the gaming may take place. *Id.*

IGRA also contains enforcement mechanisms. IGRA confers jurisdiction on the federal district courts over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). This provision "partially abrogates tribal sovereign immunity," but only for cases that fall within § 2710(d)(7)(A)(ii)'s terms. *Bay Mills*, 572 U.S. at 791. In *Bay Mills*, for example, Michigan sued an Indian tribe because the tribe opened a casino *off* Indian lands in violation of both IGRA and the tribal-state compact. *Id.* at 786–87. The Supreme Court observed, however, that IGRA's abrogation clause covered only gaming operations "located on Indian lands," and because Michigan's suit challenged "gaming activity *off* Indian lands," the suit did not fall within IGRA's abrogation clause. *Id.* at 791.

Section 2710(d)(7)(A)(ii) thus breaks down into four elements: (1) the suit must be "initiated by a State or Indian tribe," (2) "to enjoin a class III gaming

12

activity," (3) "located on Indian lands," and (4) "conducted in violation of any Tribal-State compact . . . that is in effect." § 2710(d)(7)(A)(ii).

Here, the Nation argues that its suit meets each element of the abrogation clause. We agree.

The first element of § 2710(d)(7)(A)(ii) focuses on *who* brings suit. And the Officials argue that § 2710(d)(7)(A)(ii)'s language only encompasses suits brought by Indian tribes that are parties to the tribal-state compact. But § 2710(d)(7)(A)(ii) is not so limited. By its plain terms, the provision abrogates immunity when the suit is "initiated by a State or Indian tribe" (and the other elements are met). § 2710(d)(7)(A)(ii). That language does not limit the abrogation clause only to those suits brought by tribes that are parties to a compact; its plain language is broader than that, including suits brought by "a[n] . . . Indian tribe." *Id.* Nothing qualifies "Indian tribe," let alone something like "that is party to the compact." So under the clause's plain language, it makes no difference *which* tribe brings suit, only that *some* tribe with standing brings suit.

Given that plain language, "our inquiry is at an end." *Woods v. Standard Ins.*, 771 F.3d 1257, 1265 (10th Cir. 2014) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)); *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) ("This case requires us to apply settled principles of statutory construction under which we must first determine whether the statutory text is plain and unambiguous. If it is, we must apply the statute according to its terms." (citation omitted)). To be sure, Congress "must make its intent . . . 'unmistakably clear in the language of the statute.'" *Lac du*

13

*Flambeau Band of Lake Superior Chippewa Indians*, 599 U.S. at 388 (quoting *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 346 (2023)).  We thus apply a clear-statement rule to statutory text perceived to abrogate tribal immunity.  *Id.*  And under that clear-statement rule, "'if there is a plausible interpretation of the statute' that preserves sovereign immunity, Congress has not unambiguously expressed the requisite intent."  *Id.* (quoting *FAA v. Cooper*, 566 U.S. 284, 290 (2012)).

Still, this clear-statement rule does not "displac[e] the other traditional tools of statutory construction," *FAA*, 566 U.S. at 291 (alteration in original) (quoting *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008)), so all that is required is that the abrogation be "clearly discernable from the statutory text in light of traditional interpretive tools."  *Id.*[10]  But one "cardinal" component of those traditional tools— one that we turn to "before all others"—is that "a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted)

---

[10] *FAA* addressed waivers of federal sovereign immunity, but the Supreme Court has adopted *FAA*'s clear-statement principles in the tribal-immunity context. *See Lac du Flambeau Band of Lake Superior Chippewa Indians*, 599 U.S. at 388.

14

(quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).  The abrogation clause's plain meaning is dispositive.

Because § 2710(d)(7)(A)(ii)'s plain language abrogates immunity for "any cause of action initiated by a[n] . . . Indian tribe," we hold that a suit brought by an Indian tribe with a plausible injury—whether a party to the tribal-state compact or not—satisfies the first element of § 2710(d)(7)(A)(ii)'s abrogation clause.  And because the Nation's claim is brought by an Indian tribe, it satisfies the abrogation clause's first element.

The Nation's claim likewise satisfies the abrogation clause's remaining elements.  The parties do not dispute that the Warm Springs Casino conducts class III gaming, so the Nation's suit seeks to enjoin a class III gaming activity.[11]  Instead, the parties focus their attention on (1) whether the Warm Springs Casino is on Indian land, and (2) whether the Nation challenges the violation of a tribal-state compact.

The Officials argue that the Warm Springs Casino is not on Indian lands.  But the Nation and Officials' dispute appears to be less about *whether* the Tsalote Allotment is on Indian lands than about *whose* Indian lands the Allotment is on.  *See* Reply Br. at 11 ("[T]he Tsalote Allotment is the Fort Sill Apache Tribe's Indian

---

[11] In the reply brief, the Officials argue that the Nation's suit fails the second element because its injunction would enjoin both class II and class III operations since the casino performs both.  But the Officials raised the argument for the first time in their reply brief—and in conclusory fashion at that.  We therefore decline to reach this issue.  *See 3484, Inc. v. NLRB*, 137 F.4th 1093, 1113 (10th Cir. 2025) (finding an issue raised for the first time in a reply brief waived).

lands."); Appellee Br. at 27 ("[T]he Tsalote Allotment is 'Indian lands' under any scenario."). The Nation's complaint alleged that "[t]he Tsalote Allotment is 'Indian land,' but is not the FSA Tribe's Indian land." App. Vol. 2 at 27. The Nation says that the Tsalote Allotment is Kiowa lands. And the Officials concede that the Tsalote Allotment is Indian lands. *See* Appellant Br. at 3; Reply Br. at 11. So regardless of whose Indian lands they are, the Tsalote Allotment remains Indian lands.[12]

The Officials also argue that the Nation's suit does not challenge a violation of a tribal-state compact. The Fort Sill Apache Tribe–Oklahoma gaming compact features a provision restricting where the Tribe may conduct gaming. It provides that "[t]he tribe may establish and operate enterprises and facilities that operate covered games *only on its Indian lands as defined by IGRA*." App. Vol. 2 at 163 (emphasis added). The Nation's IGRA claim targets that provision: it argues that the Tribe is operating the White Springs Casino on Kiowa lands, not on its own lands. The Officials counter that the White Springs Casino rests on Fort Sill Apache Tribe lands, not Kiowa lands.

We conclude that the Nation's suit challenges a violation of the Tribe–Oklahoma gaming compact. The Officials sidestep the relevant inquiry—whether the

---

[12] The Officials argue that Indian trust lands must be land held in trust for the *tribe*. And because Kiowa tribe "relinquished any claim it had" to the Allotment, the lands cannot be Indian lands under the Nation's theory. Reply Br. at 9. But that ignores IGRA's definition of Indian lands, which covers "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe *or individual*." 25 U.S.C. § 2703(4)(B) (emphasis added).

Nation's claim challenges the violation of the location provision—and invites us to conclude on the merits that the Tsalote Allotment is actually the Tribe's lands. *See* Reply Br. at 11 (explaining that the Tsalote Allotment is the Tribe's land and calling the Nation's argument to the contrary "completely baseless"). But this case comes to us on a motion to dismiss, and we are bound to accept well-pleaded allegations as true and draw reasonable inferences in the Nation's favor. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147–48 (10th Cir. 2015).

The Nation's complaint alleges that the Allotment was originally held in trust for George Tsalote, a member of the Kiowa tribe, App. Vol. 2 at 11, rendering it an "original Kiowa allotment," App. Vol. 2 at 12. The complaint further alleges that the Tribe purchased the Allotment, and "the BIA deeded the land in trust to the FSA Tribe." App. Vol. 2 at 16. But, the Nation alleges, this transfer was invalid—void and without effect—because the "Tribe did not validly acquire the Tsalote Allotment." App. Vol. 2 at 27. So according to the Nation, the Tsalote Allotment remains Kiowa lands, not Fort Sill Apache Tribe lands, and thus operating the casino there "violates the FSA Tribe's tribal-state compact with Oklahoma." App. Vol. 2 at 27. We think those allegations challenge a violation of the Tribe's gaming compact with Oklahoma.

The Nation's IGRA claim is a cause of action initiated by an Indian tribe to enjoin a class III gaming operation on Indian land conducted in violation of a gaming compact. The claim therefore falls within § 2710(d)(7)(A)(ii), and that provision

17

abrogates the Tribe's tribal immunity against the claim.  Tribal immunity does not

protect the Officials from the Nation's IGRA claim.

### 2.  *Official-Capacity Claim under RICO*

The Nation next argues that *Ex Parte Young* displaces tribal immunity for its

RICO claim, which seeks injunctive and declaratory relief.  Although *Ex Parte Young*

applies most often to state sovereign immunity, we also apply the doctrine to tribal

immunity.  *Crowe & Dunlevy*, 640 F.3d at 1154–55 (10th Cir. 2011) ("[W]e join our

sister circuits in expressly recognizing *Ex parte Young* as an exception not just to

state sovereign immunity but also to tribal sovereign immunity.").  The *Ex Parte

Young* doctrine permits a plaintiff to circumvent tribal sovereign immunity by

"seeking to enjoin alleged ongoing violations of federal law."  *Norton*, 862 F.3d at

1251 (quoting *Crow & Dunlevy*, 640 F.3d at 1154).  The exception applies to suits

against *tribal officials*, not against the *tribal entity*.  *Id.* (finding *Ex Parte Young*

inapplicable because the "complaint asserts claims against those tribal entities rather

than their constituent officials").

To determine whether *Ex Parte Young* applies, the court "need only conduct 'a

straightforward inquiry'" into (1) whether the "complaint alleges an ongoing

violation of federal law," and (2) whether the complaint "seeks relief properly

characterized as prospective."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535

U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261,

296 (1997)).  But even where those two elements are met, Congress may have limited

the availability of an *Ex Parte Young* suit.  That is so when Congress has enacted a

18

"carefully crafted and intricate remedial scheme" to remedy the statutory violation. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). And that limited relief "display[s] an intent not to provide the 'more complete and more immediate relief' that would otherwise be available under *Ex parte Young*." *Verizon*, 535 U.S. at 647 (quoting *Seminole Tribe*, 517 U.S. at 75)).

*Ex Parte Young* also requires that the plaintiff sue an official charged with enforcing the challenged provision or engaging in challenged conduct. *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) ("Under *Ex Parte Young*, a state defendant sued in his official capacity must 'have some connection with the enforcement' of a challenged provision." (quoting *Ex Parte Young*, 209 U.S. at 157)); *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1260 (10th Cir. 2002) (describing a proper *Ex parte Young* suit as "seek[ing] only prospective, injunctive relief against state officers charged with carrying out the [challenged conduct]").

The Nation seeks to enjoin the operation of the White Springs Casino, but it has not alleged a connection between the Officials and the continuing operation of the White Springs Casino. The Nation does not allege that the Officials "have a particular duty to" operate the casino. *Id.* (citing *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)). There are two groups of Officials here: members of the Tribe's governing board and members of the Tribe's gaming commission. At most, the Nation alleges that the Officials on the governing board voted or approved the operation of the casino at some point in the past. *See, e.g.*, App. Vol. 2 at 6 ("Ware is the Chairwoman of the Fort Sill Apache Tribe and is the

19

official charged with supervising the affairs of the FSA Tribe and its business committee."); App. Vol. 2 at 7 ("Mann is . . . the official charged with . . . developing proposals relating to implementing programs."). Those allegations do not show a connection to the continuing operation of the White Springs Casino. As for the Officials on the gaming commission, the Nation only alleges that they "ensur[e] compliance" with gaming laws. *See* App. Vol. 2 at 7–8. But having a duty to ensure compliance is not the same as having a duty to operate the casino.

The Nation's responses are unconvincing. It first argues that the Officials waived their *Ex Parte Young* counterargument. But because tribal immunity raises a jurisdictional issue, *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1009 (10th Cir. 2007), we have an independent obligation to consider jurisdictional defects. So we must consider whether *Ex Parte Young* applies, even if the Officials did not raise the issue below. The Nation's back-up argument is that it has "alleged in detail" that the Officials have authority over the casino's continuing operations. But aside from the Nation's allegations that some of the Officials hold compliance authority, the Nation offers a general allegation that the Officials are "conspiring to cause the Enterprise to open and operate an illegal gambling business." App. Vol. 2 at 30. But those allegations do not address any *particular* duty or power that the Officials have to operate the casino. *See Chamber of Com.*, 594 F.3d at 760. The Nation's remaining allegation says that the "Fort Sill Apache Gaming Commission . . . is the tribal entity charged with operating the Enterprise's casino gaming pursuant to IGRA." App. Vol. 2 at 29 ¶ 106. But the complaint repeatedly

alleges that the gaming commission "is the tribal entity charged with regulating the FSA Tribe's casino gaming pursuant to IGRA," App. Vol. 2 at 7, and that the commissioners are "charged with ensuring compliance with federal and state gaming laws," App. Vol. 2 at 7–8. So the natural reading of the Nation's allegation in ¶ 106 is simply that the commission is charged with ensuring the casino is operated in accordance with IGRA.

In short, *Ex Parte Young* does not help the Nation because its claims are not against officials charged with operating the casino.

C.      ***Individual-Capacity Claim under RICO***

The Officials raise two arguments against the Nation's individual-capacity RICO claims: (1) these claims, though nominally against the Officials, are actually against the Tribe, so tribal immunity still applies, and (2) if the claims are actually against the Officials, then they are entitled to qualified immunity. We conclude that the Officials cannot rely on tribal immunity because the tribe is not the real party in interest—only the individual Officials are. And we are without jurisdiction to consider the Officials' qualified immunity because that issue formed no part of the collateral order decided below.

The Nation's RICO theory is that the Officials have conspired to operate the Warm Springs Casino, which (they allege) constitutes a pattern of racketeering activity consisting of illegal gambling and money laundering. *See* 18 U.S.C. § 1955 (illegal gambling); 18 U.S.C. §§ 1956, 1957 (money laundering).

A suit challenging an official's acts comes in two varieties: official-capacity claims and individual-capacity claims.  Both varieties name the individual officer as defendant, but they are distinguished by who stands as the real party in interest—the individual officer or the entity on whose behalf the individual acts.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).  In an official-capacity claim, the entity stands as the real party in interest because official-capacity suits "generally represent only another way of pleading an action *against an entity* of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (emphasis added) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).  And when the entity is the real party in interest, the officer—though named as defendant—may raise the immunities "that the government entity possesses." *Hafer*, 502 U.S. at 25. Conversely, when the officer himself is the real party in interest, then he may raise "*personal* immunity defenses," like qualified immunity.  *Lewis v. Clarke*, 581 U.S. 155, 163 (2017).  These rules apply equally in the tribal sovereign immunity context and in the state sovereign immunity context.  *Id.* ("There is no reason to depart from these general rules in the context of tribal sovereign immunity.").

To determine whether the Officials here can raise the Tribe's immunity, we ask whether the Tribe is "the real party in interest" because that "dictates what immunities may be available" to the official.  *Id.*  The touchstone for the real-party-in-interest inquiry is "who may be legally bound by the court's adverse judgment." *Id.* at 165.  We do not "simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought

is truly against the sovereign." *Id.* at 162 (citing *Ex parte New York*, 256 U.S. 490, 500–02 (1921)). And when a plaintiff seeks to impose "*individual* liability," *id.* at 162, on the defendant for "his individual wrongdoing," *id.* at 165–66, the judgment binds the individual officer, not the tribe. *Id.* at 163 (explaining that judgment against defendant for his personal actions "will not operate against the Tribe"). In that scenario, the remedy is against the individual, not the tribe.

These principles foreclose the Officials' reliance on the Tribe's immunity. The Nation seeks to impose individual liability on the Officials for individual acts that they have taken in furthering an unlawful enterprise. The Officials themselves, then, would be "legally bound by the court's adverse judgment" regarding the RICO claims, not the Tribe. That fact means that as far as the RICO claim goes, the Officers—not the Tribe—are the real parties in interest. And because the Officers are the real parties in interest, they cannot raise the Tribe's sovereign immunity.

Recognizing this possible outcome, the Officials argue in the alternative that they are entitled to qualified immunity. But we do not have jurisdiction under the collateral-order doctrine to consider this issue. The Officials never raised qualified immunity before the district court, so the district court neither explicitly nor implicitly denied the Officials' qualified immunity. No order denying qualified immunity therefore provides an independent ground to exercise our collateral-order jurisdiction in this case. Instead, our jurisdiction here arises from the court's denial of tribal immunity.

When an appeal comes to us in this jurisdictional posture, our jurisdiction is limited to reviewing (1) the court's denial of tribal immunity and (2) "otherwise nonfinal and nonappealable lower court decision[s] that overlap[] with an appealable decision" over which we choose to exercise pendent jurisdiction. *Moore v. City of Wynnewood*, 57 F.3d 924, 929 (10th Cir. 1995) (citing *Snell v. Tunnell*, 920 F.2d 673, 676 (10th Cir. 1990)). Qualified immunity, of course, is not tribal immunity, so the court's denial of tribal immunity does not encompass a denial of the Officials' qualified immunity. And we will not invoke our pendent jurisdiction here—an exercise that is "generally disfavored," *Cox v. Glanz*, 800 F.3d 1231, 1255 (10th Cir. 2015) (quoting *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1264 (10th Cir. 1998)).[13] The Officials have not explained why we should exercise our pendent jurisdiction; they simply encourage us to resolve qualified immunity "at the earliest possible stage." Appellant Br. at 31 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). And they argue that qualified immunity cannot be waived. But that conflates whether the Officials *waived* qualified immunity with whether we have *jurisdiction* to review the issue.

In sum, because qualified immunity formed no part of the order below and we decline to exercise pendent jurisdiction, we do not have jurisdiction to review the issue of the Officials' qualified immunity.

---

[13] We also doubt whether we could exercise pendent jurisdiction over an issue never decided in the district court. *Cox*, 800 F.3d at 1231 (characterizing pendent jurisdiction as operating on "otherwise nonappealable *decisions*").

## III.    Conclusion

For the forgoing reasons, we affirm in part and reverse in part.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

April 21, 2026

Robert Daniel Carter
Foster Garvey
401 South Boston Avenue, Suite 500
Tulsa, OK 74103

Devra R Cohen
Kelly Ann Mennemeier
Foster Garvey
1111 Third Avenue, Suite 3000
Seattle, WA 98101

**RE:    24-6221, Comanche Nation v. Ware, et al**
Dist/Ag docket: 5:22-CV-00425-G

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

2

cc: Shoney Blake
Cara Nicole Cobb
Joe Wiley Keene
Wilson K. Pipestem
Alison Spurlock

CMW/art